MARY BELL ORNDOFF *and* LEWIS ORNDOFF

*v.*

TEDDY ROWAN *and* STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

(No. 13100)

Submitted September 19, 1972.  Decided October 24, 1972.

*Oakley J. Hopkins*, for appellants.

*Farmer & Farmer, George R. Farmer, Jr.*, for appellees.

KESSEL, JUDGE:

This case is before the Court upon an appeal by the defendants, Terry Rowan and State Farm Mutual Automobile Insurance Company, from a final judgment of the Circuit Court of Monongalia County in a civil action instituted by Mary Bell Orndoff and Lewis Orndoff, as the plaintiffs, to recover damages for the personal injuries of Mary Bell Orndoff suffered when she was struck by an automobile, owned by State Farm Mutual Automobile Insurance Company and operated by Teddy Rowan, and for loss of consortium of his wife, Mary Bell Orndoff, by her husband, Lewis Orndoff, and for medical and hospital expenses incurred and to be incurred in the future by the husband, Lewis Orndoff, and for expenses incurred by him for domestic help.

The plaintiffs, the appellees, will be referred to in this opinion as the plaintiffs and the defendants, the appellants, will be referred to as the defendants. Reference to a singular plaintiff or defendant shall mean the parties personally involved in the accident.

The trial court entered judgment upon a jury verdict in the amount of $18,000 in favor of Mary Bell Orndoff and $5,000 in favor of Lewis Orndoff and against State Farm Mutual Insurance Company and Teddy Rowan.

The defendants, in their petition for a writ of error, assign eleven grounds of error. We have condensed them into four, which are as follows: (1) Was it error to refuse the testimony of the city patrolman with reference to the significance of the skidmarks? (2) Was it error to give Plaintiffs' Instructions Nos. 1 and 1-A? (3) Was the defendant, Rowan, not guilty of primary negligence as a matter of law? (4) Was the plaintiff, Mary Bell Orndoff, guilty of contributory negligence as a matter of law? We will discuss the errors in the order mentioned above.

On the day of the accident, the plaintiff, accompanied by a friend, Bessie Fox, traveled from her home in Mt. Morris, Pennsylvania, to Morgantown, West Virginia, for the purpose of seeing Dr. Hugh Thompson for a scheduled physical examination and doing some shopping. The plaintiff was in her ninth month of pregnancy at the time, and, following her visit to Dr. Thompson, she and her friend drove to the S & H Green Stamp Store, which is located on University Avenue in Morgantown. After having made some purchases at the stamp store, the plaintiff and her friend walked down University Avenue to the intersection of Court Alley, sometimes called Court Street, and University Avenue and proceeded to attempt to cross the street to the opposite side where the Plaid Stamp Store is located.

At approximately 12:33 p.m., on a bright, sunny October day, the plaintiff was struck by an automobile driven by Teddy Clair Rowan, the defendant. University Avenue, at the location of the accident, is a four-lane public highway, which is a part of both the state and city road systems. At the place where the accident occurred, University Avenue has two southbound and two northbound lanes of traffic. The flow of traffic is controlled by traffic lights at the intersection of Walnut Street and University Avenue, which is approximately 200 feet north of the scene of the accident, and at the intersection of Pleasant Street and University Avenue, which is approximately 200 feet south of the scene of the accident. The plaintiff was attempting to cross

University Avenue from the western side to the eastern side, the western side being adjacent to the southbound lanes of traffic. University Avenue is forty feet wide at this point with sidewalks thirteen feet wide on each side, making sixty-six feet in all, including the street and both sidewalks. The plaintiff was attempting to cross University Avenue at the point where Court Alley intersects it, starting from the northwestern corner of the intersection of said street and alley. Court Alley is twelve feet wide and has no sidewalks at this intersection.

The defendant testified that he was proceeding down Walnut Street in the far left lane of traffic to University Avenue; that his speed was approximately five to ten miles an hour at the time he negotiated the curve at the intersection; that he increased his speed to approximately fifteen to twenty miles an hour as he proceeded into the far right southbound lane on University Avenue, which is a continuous right-hand turn lane; that after leaving the intersection of Walnut Street and University Avenue, he had a clear and unobstructed view of the lane between him and the scene of the accident; that, when he observed the plaintiff step into the street, he applied his brakes immediately and his car skidded for a distance of twenty-seven feet; that he stopped his vehicle approximately four feet after striking the plaintiff; that he got out of his car and went to the plaintiff; and that the plaintiff said: "Why didn't I look, why didn't I look".

The plaintiff testified as follows:

"Well, I walked down then to the corner, and I was observing the traffic — I — I checked the traffic, and the traffic in front of me was sitting still — going north; then I looked up the street, and I looked down the street, and I observed that the light was red at the top of the street, and I started across the street, and I was out in the street about three or four steps, and I just caught something out of my left eye, and I looked up, and Mr. Rowan was coming — and he came at a fast speed, and he startled me, and I started to back up; I thought well, if I — if I go

frontwards, he's going to run over me, and I've got to get out of the way; he scared me so bad that I started back, and I had my right foot either on the walk or against it — back against that, and the car struck my left leg right above the knee and knocked it out from under me up — up in here like that, you know — landed on my bottom side — put this leg out straight, and this one across like that."

On cross-examination, the plaintiff testified that nothing was obstructing her vision and that she thought she "had a good view"; that the University Avenue traffic light at Walnut Street was red and that the traffic in the two northbound lanes was stationary; that she observed no automobiles in either of the two southbound lanes of traffic; and that she did not remember making any statement to the effect that she had not looked for traffic before entering the street.

Bessie Fox, the friend who accompanied the plaintiff on the trip to Morgantown, testified that, as she and the plaintiff reached the intersection, the plaintiff said " 'the light is red; there's no cars, and it's a good time to cross.' " The witness testified that she then looked to see if any cars were approaching, and she and the plaintiff entered the street. In addition the witness testified as follows:

"Q   Alright, now, after she told you the lights were clear, what did she then do, do you recall?

A   She started to — started to — you know, to the edge of the curb and started to step off the edge of the curb, so —

Q   Did she go out into the street?

A   Yes, I — I guess, yes.

Q   What was the next thing that you observed?

A   I was looking either down — south of the street, and I was watching my footing because I wear bifocals, and I always look down — and then I — there was something attracted my attention, and I looked up.

Q   And what did you see?

A  I saw her with her hands up. I can remember — I could see her pocketbook — and I screamed, and I — I just don't know just what I did, but I screamed. I screamed, if I remember, "Mary Bell, My God".

Q  Well, did you go to her?

A  Well, it wasn't far to go because she was coming back around — you know, towards back where I was.

Q  Well —

A  But — yes, I got right to her too.

Q  What — what transpired? Did she fall completely down on the sidewalk or what — what happened to her when you saw her coming backwards?

A  She just started — semi-curve and stepped down — just knocked — set down on the sidewalk."

John Meister, who witnessed the accident while sitting in his automobile in the left southbound lane of traffic, testified that he was stopped in a line of traffic at the left rear of the defendant's automobile; that traffic in his lane was backed up from the traffic light at the corner of University Avenue and Pleasant Street to the S & H Green Stamp Store; that he saw the two women walking in the vicinity of the stamp store and "one of them sort of stopped — they — and the other one just stepped right out into the street, and the one lady somehow stayed behind her"; and that at the time she stepped into the street, the traffic was moving in the right lane. He further testified that he got out of his car and went to the plaintiff and that she said: "I should have looked — or I didn't look at all."

On cross-examination Meister testified that the plaintiff had moved about three steps before being struck and that he did not observe her attempt to move back toward the curb.

The plaintiff called James L. Lattanzi as one of her witnesses. At the time of the accident he was employed as a city patrolman for the city of Morgantown and as such officer he investigated the accident soon after it occurred. He testified that the defendant's car skidded twenty-seven feet immediately before the accident. He arrived at this conclusion by measuring the skidmarks on the pavement, which ran back from the rear wheels of the defendant's car on University Avenue in a northerly direction towards the Walnut Street intersection. The city patrolman further stated that the street was completely dry that day and the weather was clear. Counsel for the defendant, upon cross-examination, asked the city patrolman to state his opinion as to the speed of the automobile of the defendant as determined by the skidmarks. Counsel for the plaintiff objected to the question upon the ground that the witness was not an expert witness and, therefore, was not qualified to give his opinion. The court sustained the objection. The witness attempted to qualify as an expert in this regard, stating that he had been on the police force of the city of Morgantown for a period of two years; that he had had some police training with reference to investigating wrecks; that he thought there was a book or two up at the station that had charts in them with reference to determining the speed of cars from skidmarks made by the car; and that he had since the accident checked these books. We hold that the court did not abuse its discretion in sustaining the objection to this testimony. Among the factors which must be considered in determining speed from skidmarks are: the material of the road surface, the material of the tires, tire tread, temperature, air pressure in the tires, and the weight of the car. The witness did not testify that he had sufficient information concerning these matters to answer the question elicited by counsel for the defendant. He merely stated that he had since the accident checked the charts which were available at the police station.

"Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." *Overton v. Fields,* 145 W.Va. 797, pt. 5 Syl., 117 S.E.2d 598. See *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.,* 152 W.Va. 549, pt. 8 Syl., 165 S.E.2d 899; *Lawrence v. Nelson,* 145 W.Va. 134, 145, 113 S.E.2d 241, 249; *Byrd v. Virginian Railway Co.,* 123 W.Va. 47, pt. 2 Syl., 13 S.E.2d 273.

Was it error to give Plaintiffs' Instructions Nos. 1 and 1-A? These instructions deal with the question of a crosswalk at the place where the accident occurred. Plaintiffs' Instruction No. 1 is a lengthy instruction, the pertinent part of which deals with a crosswalk and is as follows:

"The laws of this State and the Ordinances of The City of Morgantown, West Virginia, require every driver operating a motor vehicle to yield the right of way either by slowing down or stopping, if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when a pedestrian is upon the half of the roadway upon which the vehicle is traveling or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, however, no pedestrian shall suddenly leave a *crub* or other place of safety and walk or run into the path of a vehicle when it is so close that it is impossible for the driver to so yield. The laws of the State of West Virginia and the Ordinances of The City of Morgantown, West Virginia, further defines crosswalk as being (a) that part of a roadway at an intersection within the connection of the lateral lines of the sidewalk on the opposite sides of the highway measured from the curbs or in the absence of curbs from the edges of the traversible roadway and (b) any portion of a roadway at an intersection or elsewhere distinctly *required* for pedestrians crossing by lines or other markings on the surface." (Italics supplied.)

Subsection (b), the portion of the instruction which refers to and defines a crosswalk, does not correctly state

the law, since the word "required", as used in the instruction, is "indicated" in the pertinent statute. The use of the word "required" instead of "indicated" puts an entirely different construction on Subsection (b) of Code, 1931, 17C-1-43, as amended, in the instruction which purports to state what the law required.

Plaintiffs' Instruction No. 1-A, which was read to the jury, is as follows:

"The Court further instructs the jury that under the laws of the State of West Virginia and the Ordinances of the City of Morgantown, West Virginia, that the northern intersection of Court Street with University Avenue in the City of Morgantown constituted a pedestrian crosswalk in an East-West direction across University Avenue from its intersecting curb on the western side of University Avenue to its intersecting curb on the eastern side of University Avenue on the date that Mary Bell Orndoff was struck by the Defendant's automobile."

Chapter 17C, Article 1, Section 43, of the West Virginia Code, 1931, as amended, defining a crosswalk, states:

"'Crosswalk' includes: (a) That part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway measured from the curbs or, in the absence of curbs, from the edges of the traversable roadway; and

"(b) Any portion of a roadway at an intersection or elsewhere distinctly indicated for pedestrian crossing by lines or other markings on the surface."

Chapter 17C, Article 10, Section 2, of the West Virginia Code, 1931, as amended, dealing with pedestrians' right of way in crosswalks, reads as follows:

"(a) When traffic-control signals are not in place or not in operation the driver of a vehicle shall yield the right of way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon

which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, but no pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield. This provision shall not apply under the conditions stated in section three [§ 17C-10-3] paragraph (b) of this article."

The Morgantown City Ordinance with reference to the right of way of a pedestrian at crosswalks is in almost the exact words as Section 2, Article 10, Chapter 17C of the Code of West Virginia, 1931, as amended, hereinbefore quoted. The City Ordinances of the City of Morgantown do not attempt to define a crosswalk, but Section 20-1 of the Morgantown City Ordinances reads:

"Except as otherwise expressly provided by this chapter, the words and phrases used in this chapter shall have the meaning respectively ascribed to them by Section 17C-1-1 to 17C-1-59 of the Code of West Virginia."

Thus, a definition of a crosswalk, according to the Morgantown City Ordinances as well as the state law, is found in Section 43, Article 1, Chapter 17C of the West Virginia Code, 1931, as amended, previously quoted in this opinion. That statute provides that a crosswalk includes that part of a street at an intersection included within the connections of lateral lines of the sidewalks on the opposite sides of the street or highway. From the evidence in this case and the exhibits filed therewith, it appears that there are no sidewalks along Court Alley or Court Street, as it is sometimes called. Thus, if Court Alley has no sidewalks, then there could be no crosswalk, as defined in Section 43, Article 1, of Chapter 17C of Code, 1931, as amended, across University Avenue at the place where Court Alley intersects with or crosses University Avenue. There being no sidewalks, there could be no lateral lines of the sidewalks.

Subsection (b), Code, 1931, 17C-1-43, as amended, provides that there might be a crosswalk at any

intersection or elsewhere if it is *"distinctly indicated for pedestrian crossing by lines or other markings on the surface."* (Italics supplied.) There was some effort on the part of counsel for the plaintiff to prove that there was a marked crosswalk at the place where the plaintiff was crossing University Avenue. The evidence fails to establish such a crosswalk as defined by Section 43, Article 1, Chapter 17C of the Code of West Virginia, 1931, as amended, which requires the crosswalks to be *"distinctly indicated for pedestrian crossing by lines or other markings on the surface."* (Italics supplied.) The plaintiff testified that she was not aware of a crosswalk at this place. The patrolman stated that there was no yellow or white crosswalk and that there were no white marks there. The defendant also testified that he saw no white marks indicating a crosswalk and at the time of the accident there was no evidence that it had been so painted. We hold that there was no crosswalk across University Avenue at the place where Court Alley intersects and crosses University Avenue or at the point where the accident occurred, according to the definition of a crosswalk found in Code, 1931, 17C-1-43, as amended, which definition was adopted by the city of Morgantown.

There was some effort made by counsel for the plaintiff to prove that there was a crosswalk designated at the place where the plaintiff attempted to cross University Avenue, which crosswalk had been established there by the City Council of the City of Morgantown by moving the crosswalk at Pleasant Street or the River Bridge to Court Street. Excerpts from the minutes of the City Council of the City of Morgantown were introduced for this purpose.

An excerpt from the meeting of the City Council of the City of Morgantown held February 21, 1967, under the heading "Continuous Right Turn at University Avenue River Bridge" reads:

"The committee has studied the following recommendations of Assistant City Manager, Glenn L. White. The

Traffic Division of the State Road Commission has just recently completed a study of this intersection. The recommendations are (1) if when this construction is done in the area, the American Service Station property is to be purchased immediately and the continuous right turn be installed or (2) if the property is not to be purchased in conjunction with construction program in this area, that the turn radius be increased as much as possible on these fifteen right of ways to allow for a continuous right-hand turn. The above recommendations have been sent to the Commissioner for his approval or disapproval. The committee recommends that the report of council dated February 7, 1967 be carried out as soon as permission is granted by the State Road Commission to allow a continuous right turn at University Avenue and the River Bridge *and that the walkway be moved to Court Street crossing* — signed by Gene Corum, Chairman, Street Committee and motion by Councilman Corum, seconded by Councilman Trevillian that the above request for the Street Committee be approved which the motion carried." (Italics supplied.)

Thereafter on May 31, 1967, which was prior to the time of the accident, the city received a confirmation from the State Road Commission approving the change of the continuous right turn at University Avenue and the River Bridge and the minutes or record of the city council reads as follows:

" 'Street Committee — Continuous right turn from University Avenue onto the Westover Bridge.' Assistant City Manager, Glenn White, has met with representatives of the West Virginia State Road Commission and made the following recommendations: (1) the entire lane for north bound traffic on University Avenue between Court Street and Pleasant Street be converted to a left turn lane for traffic turning left from University Avenue onto Pleasant Street, (2) the inside lane for north bound traffic on the south side of the intersection would be for left turns only, (3) the inside lane for south bound traffic on the north side of the intersection would be for through traffic only,

(4) the outside lane for south bound traffic on the north side of the intersection will be for the continuous right turn only, (5) the State Road Commission will furnish and erect the necessary overhead lane marking signs. The committee recommends that these recommendations be accepted and be put into effect on a trial basis as soon as possible, signed Gene Corum, motion by Councilman Corum, seconded by Councilman Trevillian that the above and for the Street Committee be approved which motion carried."

The evidence discloses that these resolutions or actions of the council were in full force and effect at the time of the accident. It will be noted, however, that the recommendation to move the walkway or crosswalk across University Avenue at the River Bridge to Court Street was not included in the recommendations approved by the State Road Commission and voted upon by the city council at the May 31, 1967, meeting. There was no evidence in the record of this case that the walkway or crosswalk was ever so moved. If it were so moved, it would not be a legal crosswalk unless it was *"distinctly indicated for pedestrian crossing by lines or other markings on the surface."* (Italics supplied.) We, therefore, hold that it was reversible error to give Plaintiffs' Instructions Nos. 1 and 1-A for the reason that there was no evidence of a crosswalk at this place.

"An instruction which is not supported by the evidence should be refused." *Lilly v. Taylor,* 151 W.Va. 730, pt. 3 Syl., 155 S.E.2d 579; *Frye v. Norton,* 148 W.Va. 500, pt. 6 Syl., 135 S.E.2d 603. "An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." *Hollen v. Linger,* 151 W.Va. 255, pt. 2 Syl., 151 S.E.2d 330.

The plaintiffs' case was predicated upon the proposition that there was a crosswalk at the place where the plaintiff was crossing when she was struck by defendant's automobile. There being no crosswalk, the giving of

Plaintiffs' Instructions Nos. 1 and 1-A was plainly prejudicial.

We do not deem it necessary to deal with the other questions presented by counsel in their assignment of error as according to our holding herein the case must be tried again.

For the reasons stated in this opinion, the judgment of the Circuit Court of Monongalia County is reversed, the jury verdict is set aside, and a new trial is awarded.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*