JARVES ADDAIR, *Admr., etc.*

*v.*

ARNOLD BRYANT, *et al.*

CATHY BALLENGEE, *Admx., etc.*

*v.*

ARNOLD BRYANT, *et al.*

(No. 14746)

Decided November 17, 1981.

*Tutwiler, Crockett, LaCaria & Murensky* and *Charles A. Tutwiler*, for appellants.

*Ballard & Brumfield and G. David Brumfield, Hostler & Shinaberry* and *Sterl F. Shinaberry*, for appellees.

MILLER, JUSTICE:

Arnold Bryant and Leander Lester, (defendants), appeal from jury verdicts rendered against them in two wrongful death actions tried in the Circuit Court of McDowell County. Their primary allegations of error are: (1) that the trial court incorrectly refused their instruction on contributory negligence; and (2) that the trial court also erred in not permitting defendants to introduce, for purposes of mitigating the damage claim, evidence that the wife of one of the plaintiffs' decedents had remarried. Certain other errors are asserted as to evidentiary matters and complaint is made that the verdicts are excessive. For the reasons more fully stated below, we affirm the trial court's judgment.

The accident giving rise to this litigation occurred on March 24, 1973, on a public highway in McDowell County.

At the time of the accident, defendant Bryant, who was employed by the defendant Lester, was operating a truck owned by Lester and acting in the scope of his employment, which was the delivery of mail. In the process of delivering mail to the Paynesville Post Office, Bryant had to make a lefthand turn across the highway to reach the parking lot in front of the post office.

The highway in front of the post office was two lanes and was curved in the nature of an "S." The post office was located in about the middle of the "S" curve. There is a dispute in the evidence as to the sharpness of the "S" curve. It appears from the evidence that from the first curve below the post office Bryant could see the road going by the post office to the second curve, and this distance is approximately 300 feet.

Defendant was driving south and had driven through the first curve, but had not reached a position opposite the post office when he started to make his left turn. Thus, the turn was angled across the highway toward his destination. Bryant slowed his truck, but did not bring it to a complete stop. He then put on his left-turn signal and reduced his gear ratio from 4th to 3rd gear. He looked ahead on the highway, saw no oncoming traffic and proceeded to make his left turn. As defendant drove into the opposite lane, he observed a motorcycle traveling toward him and estimated its distance at perhaps 125 feet. At this point, his truck had the entire opposite lane blocked; in an attempt to avoid the accident, Bryant increased the speed of his truck to pull it off the highway.

Bryant lost sight of the motorcycle as he attempted to get his truck completely off the highway, but felt the jolt of the motorcycle as it struck the truck. Both individuals on the motorcycle were thrown off and killed. The accident occurred at approximately 2:00 p.m. on a clear, sunny day.

A Mr. Sexton was the only other person able to see any part of the accident. His deposition was read to the jury by agreement of counsel. Sexton was behind Bryant's truck some 500 to 1000 feet. His vision of the highway ahead of

Bryant's truck was obscured by the truck bed which was van-like in nature. He saw the truck start its left turn across the highway, but did not see the motorcycle approaching. Sexton then saw the motorcycle as it struck off the right rear corner of the truck, throwing its two passengers into the air.

A Trooper Ryan investigated the accident scene. He noted the presence of marks and scratches on the right rear portion of the truck. Ryan also observed that the motorcycle and its riders had come to rest on the same side of the highway as the truck, but north of it.

## I.

This case was tried in 1979 prior to the modification of our contributory negligence rule in *Bradley v. Appalachian Power Company*, 163 W. Va. 332, 256 S.E.2d 879 (1979). The trial court was of the view that the defendants were not entitled to an instruction on contributory negligence because there was no evidence of any contributory negligence on the part of the person operating the motorcycle. The primary basis for this ruling was that no witness at trial had testified that the motorcycle was traveling in excess of the speed limit.

It is important to remember that Bryant's angled turn across the highway toward the post office parking lot was a left turn across the highway. In *Adkins v. Minton*, 151 W. Va. 229, 236, 151 S.E.2d 295, 301 (1966), we commented on a left turn across a highway between intersections:

> "It has been held that the making of a left turn into a passing lane or across oncoming traffic is the most dangerous movement a vehicle can make on the highway, and the driver of a vehicle making such movement must ascertain if it can be done with safety."

In *Adkins* we also referred to W. Va. Code, 17C-8-8(a), which requires that no person shall "turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a

roadway unless and until such movement can be made with reasonable safety."[1]

This imposition of a higher degree of care when making a left turn is generally recognized by other courts, although the phrasing of the rule may be different.[2] Some courts recognize that a high degree of care must be exercised, but regard this as another way of stating that reasonable care "means care commensurate with the apparent danger." *Green v. Boney*, 233 S.C. 49, 56, 103 S.E.2d 732, 735 (1958). In *Blaisdell v. Reid*, 352 A.2d 756 (Me. 1976), the court made this statement in regard to a driver making a left turn across the highway:

---

[1] The complete text of W. Va. Code, 17C-8-8(a), which also requires the giving of turn signals, is:

"(a) No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in sections two, three, four or five [§§ 17C-8-2 to 17C-8-5] of this article, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement."

[2] Some courts have noted the distinction between a left turn at an intersection and a left turn between intersections. This distinction often arises by virtue of particular motor vehicle statutes. 8 Am.Jur.2d *Automobile & Highway Traffic*, §§ 883-84 (1980). Under W. Va. Code, 17C-9-2, a driver of a vehicle must yield the right of way when he is at an intersection intending to make a left turn as to those vehicles within the intersection or so close thereto to constitute an immediate hazard:

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but said driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn and the drivers of all other vehicles approaching the intersection from said opposite direction shall yield the right-of-way to the vehicles making the left turn." W. Va. Code, 17C-9-2.

*See, McMillen v. Dettore*, 161 W. Va. 346, 242 S.E.2d 459 (1978), where we required a standard of "due care under the circumstances" for left-turning motorists at intersections.

"[A] demand for extraordinary care and caution is by no means unreasonable in view of the hazard inherent in crossing a lane that is being used by oncoming traffic where no traffic controls are present." 352 A.2d at 759.

The Nebraska court in *Petersen v. Schneider*, 153 Neb. 815, 46 N.W.2d 355 (1951), *modified*, 154 Neb. 303, 47 N.W.2d 863, echoed much the same statement made in our *Adkins* case, *supra*: "The most dangerous movement on public streets or highways is the left-hand turn." 153 Neb. at 819, 46 N.W.2d at 358. *E.g., Tyler v. Drennen*, 255 Ala. 377, 51 So.2d 516 (1951); *Bond v. Jack*, 387 So.2d 613 (La. Ct. App. 1980); *Facianne v. Greene*, 379 So.2d 847 (La. App. 1980); *Jacobs v. Kimbrough*, 376 So.2d 1273 (La. App. 1979); *Esponette v. Wiseman*, 130 Me. 297, 155 A. 650 (1953). *See also Rowedder v. Rose*, 188 Neb. 664, 199 N.W.2d 18 (1972); *Keller v. Wellensiek*, 186 Neb. 201, 181 N.W.2d 854 (1970); *Kreger v. Ervin Clark Const. Co.*, 166 Neb. 252, 88 N.W.2d 778 (1958); *Berbohn v. Pinkerton*, 208 Okla. 242, 255 P.2d 260 (1953).

We believe the trial court was correct in rejecting the defendant's contention that he was entitled to a contributory negligence instruction. Ordinarily, questions of negligence and contributory negligence are matters for the jury under proper instructions. *Reilley v. Byard*, 146 W. Va. 292, 119 S.E.2d 650 (1961); *Davis v. Sargent*, 138 W. Va. 861, 78 S.E.2d 217 (1953). We have also recognized that proof of such defenses as contributory negligence rests with the defendant, stating the rule in Syllabus Point 6 of *Leftwich v. Wesco Corporation*, 146 W. Va. 196, 119 S.E.2d 401 (1961), *overruled on other grounds, Bradley v. Appalachian Power Company*, 163 W. Va. 332, 256 S.E.2d 879 (1979):

"Contributory negligence on the part of the plaintiff is an affirmative defense. There is a presumption of ordinary care in favor of the plaintiff, and where the defendant relies upon contributory negligence, the burden of proof rests upon the defendant to show such negligence unless it is disclosed by the plaintiff's evidence or may be

fairly inferred by all of the evidence and circumstances surrounding the case."[3]

*See also Yates v. Mancari,* 153 W. Va. 350, 168 S.E.2d 746 (1969). Where defendant has failed to furnish such proof, he may be denied an instruction on the issue. *Gault v. Monongahela Power Company,* 159 W. Va. 318, 223 S.E.2d 421 (1976); *Orndorff v. Rowan,* 156 W. Va. 205, 192 S.E.2d 220 (1972); *Cross v. Noland,* 156 W. Va. 1, 190 S.E.2d 18 (1972).

The primary contention here is that the plaintiffs' decedents had a duty to avoid colliding with the truck that was in their lane of travel. The operator of the truck was making an angled left turn across the highway in close proximity to a curve which obscured his vision to some extent. The execution of the left turn in these circumstances was fraught with danger, particularly since it was an angled turn carrying the truck toward the curve in the opposite lane. Plaintiffs' decedents were coming in the opposite direction around the curve and struck the right rear of the truck. Under this set of facts, we find no evidence that the plaintiffs' decedents were contributorily negligent.[4]

## II.

Defendants contend that the verdicts awarded the two plaintiffs in the amounts of $25,000 and $40,000 were excessive. Both parties acknowledge that the wrongful death act in effect at the time of the accident in 1973 permitted recovery of $10,000 for loss of solatium with an additional $100,000 for pecuniary loss. W. Va. Code, 55-7-6 (1965). We recently discussed this same statute at some length in *Bond v. City of Huntington,* 158 W. Va. 592, 276 S.E.2d 539 (1981). In that case, we recognized that parents,

---

[3] It should be noted that *Bradley v. Appalachian Power Company,* 163 W. Va. 332, 256 S.E.2d 879 (1979), which set the rule of comparative negligence, did not purport to change the defendant's burden of proof for contributory negligence.

[4] Defendants also argue that they should have had a directed verdict on liability, but in light of the foregoing discussion this point is without merit.

as dependent distributees of a deceased child who was age 18 and lived at home, could recover pecuniary loss where the daughter "contributed household services but no direct monetary support." 276 S.E.2d at 540. We relied upon Syllabus Point 2 of *Salerno v. Manchin*, 158 W. Va. 592, 213 S.E.2d 805 (1974):

> "Under the West Virginia wrongful death statute a dependent distributee may be one who is partially dependent upon the deceased for services and may recover for pecuniary loss within the limits under the statute."

In the present case, one of the plaintiff's decedents was Gary Dennis Addair, a 15-1/2-year-old boy who helped out at home doing household chores and ran errands for the family. He also performed odd jobs for neighbors, for which he was paid, and this money was contributed toward his support. The jury rendered a total verdict of $25,000 in his case, $10,000 for solatium, $1700 for funeral expenses, and the balance of $13,300 for pecuniary loss. We do not find the verdict to be excessive.

The defendants' argument as to the excessiveness of the $40,000 verdict in the Ballengee case rests on the fact that Mrs. Ballengee, left a widow by the accident, had remarried in the six-year interval between the time of the accident and the date of the trial. The defendants sought to introduce evidence of her remarriage in order to mitigate her claim for pecuniary loss resulting from the death of her husband. The trial court declined to permit this evidence to come before the jury. We believe the trial court was correct in its ruling.

This point was raised but not extensively discussed in *Dimmey v. Wheeling & Elm Grove Railroad Co.*, 27 W. Va. 32 (1885), where we held in Syllabus Point 6:

> "Where the husband as administrator of his deceased wife brought an action to recover damages of a street railroad company for causing her death, and he was on trial examined as a witness on his own behalf, it was improper on cross examination to ask him: 'Are you not engaged to be married again.' "

It does not appear that we have had occasion to discuss this question since the *Dimmey* case. It is generally recognized that evidence of the remarriage of a surviving spouse, or the possibility of such remarriage, ordinarily is not admissible to mitigate damages in a wrongful death action. *Benwell v. Dean,* 249 Cal. App.2d 345, 57 Cal. Rptr. 394 (1967); *Wright v. Dilbeck,* 122 Ga. App. 214, 176 S.E.2d 715 (1970); *Hardware State Bank v. Cotner,* 55 Ill.2d 240, 302 N.E.2d 257 (1973); *Bloomington v. Holt,* 172 Ind. App. 650, 361 N.E.2d 1211 (1977); *Dubil v. Labate,* 52 N.J. 255, 245 A.2d 177 (1968); *Evans v. Reading Co.,* 242 Pa. Super. 209, 363 A.2d 1234 (1976); *Wiesel v. Cicerone,* 106 R.I. 595, 261 A.2d 889 (1970); Annot., 88 A.L.R.3d 926 (1978); Annot., 87 A.L.R.2d 252 (1963).[5]

Several reasons are advanced for this rule. First, there is a recognition that the cause of wrongful death arises at the time of the decedent's death and the damages are determined as of that time. *Seaboard Air Line R. Co. v. Connor,* 261 F.2d 656 (4th Cir. 1958). Second, the issue of the amount of pecuniary contribution by the new spouse is somewhat speculative since it involves not only a comparison with the former spouse's contribution but also whether the new marriage may be continuing. *Hightower v. Dr. Pepper Bottling Co.,* 117 So.2d 642 (La. App. 1959). Finally, a number of courts recognize an analogy to the collateral source rule, holding that a defendant is precluded from offsetting his damages from collateral benefits that the injured party independently receives. *Dubil v. Labate,* 52 N.J. 255, 245 A.2d 177 (1968).

### III.

Defendants next claim that the trial court erred in permitting into evidence portions of the cross-examination in the deposition of witness Sexton, which deposition

---

[5] Originally, Michigan was one of several states taking a contrary view, but in *Bunda v. Hardwick,* 376 Mich. 640, 138 N.W.2d 305 (1963), it reversed its prior cases and adopted the majority view. Other states adhering to the minority view are: *Campbell v. Schmidt,* 195 So.2d 87 (Miss. 1967); *Jensen v. Heritage Mutual Insurance Co.,* 23 Wis.2d 344, 127 N.W.2d 228 (1964).

was read to the jury at trial. Mr. Sexton was deposed prior to trial at the request of the defendants. During the course of his cross-examination by plaintiffs' counsel, Sexton was asked for purpose of impeachment if he had not stated in an earlier written statement: "The rear of the motorcycle hit the right rear of the mail truck. ..." Defendants' counsel objected but the nature of his objection at the deposition is unclear.

Prior to the introduction of the deposition at trial, defendants' counsel again objected to the question, contending that there was not a proper foundation for impeachment made at the deposition, since the witness was not shown the statement prior to being asked about it. It is obvious that if this objection had been made at the deposition, opposing counsel might have cleared the matter up at that time. The trial court could have correctly overruled the objection based on *West Virginia Rules of Civil Procedure*, Rule 32(d)(3)(A).[6] Aside from this technical basis for sustaining the trial court's ruling, the record discloses that after the question was asked, the objection made, and before the witness answered, opposing counsel was shown the statement. At no time did the witness ask to see it and his answer was essentially compatible with the statement in question.

In the past, we generally recognized that in order to impeach a witness with his prior inconsistent statement, it was necessary to lay a foundation for the statement before questioning the defendant concerning it. *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956); *State v. Hicks*, 107 W. Va. 418, 148 S.E. 131 (1929); *Jaggie v. Davis Colliery*

---

[6] Mr. Sexton was deposed in April of 1979, after the June 1, 1978 Amendment to the West Virginia Rules of Civil Procedure (R.C.P.). Rule 30(c), R.C.P., requires the noting of all objections made at a deposition by the officer taking the deposition. Rule 32(d)(3)(A), R.C.P., provides:

"Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time."

*Co.,* 75 W. Va. 370, 84 S.E. 941 (1914); *State v. Kinney,* 26 W. Va. 141 (1885); *Morgan v. Franklin Ins. Co.,* 6 W. Va. 496 (1873); F. Cleckley, *Handbook on Evidence,* p. 119, *et seq.* (1978). The reason for this rule is that the witness should be initially apprised of the statement in order that his memory is refreshed and he can be made aware of the circumstances surrounding the making of the statement. *State v. Carduff,* 142 W. Va. 18, 93 S.E.2d 502 (1956); *Morgan v. Franklin Ins. Co.,* 6 W. Va. 496 (1873). Our typical syllabus point in this area, covering both criminal and civil cases, is found in Syllabus Point 1 of *State v. Worley,* 82 W. Va. 350, 96 S.E. 56 (1918), and Syllabus Point 3 of *Spence v. Browning Motor Freight Lines, Inc.,* 138 W. Va. 748, 77 S.E.2d 806 (1953).[7] The foundation rule appears to be accepted in other jurisdictions, *McCormick on Evidence* §§ 28 and 37 (1972 ed.), although it is by no means a universal rule, 81 Am.Jur.2d *Witnesses* § 605 (1976). The rule has been criticized as preventing effective cross-examination by requiring disclosure of the impeaching material in advance of the question. *McCormick on Evidence* pp. 55-56, *supra.*

The problem arises in determining the extent of the "foundation" that must be made before the specific impeaching questions can begin. The strict or orthodox rule requires that the witness sought to be impeached must be given specific advanced notice of the time, place and person to whom the prior inconsistent statement was made. If the prior inconsistent statement was in writing the witness must be shown such statement in advance of the impeaching questions. *McCormick on Evidence* § 37 (1972 ed.); 3A Wigmore, *Evidence* § 1029 (Chad. rev. 1970).[8]

---

[7] Syllabus Point 3 of *Spence v. Browning Motor Freight Lines, Inc., supra,* states:

" 'After the foundation therefor is properly laid by calling his attention to prior statements inconsistent with his testimony, a witness may be impeached by proving such statements, and whether the witness denies or fails to recollect them is not material.' Pt. 1 Syl., State v. Worley, 82 W. Va. 350 [96 S.E. 56 (1918)]."

[8] McCormick observes that the foundation rule originated in England in *Queen Caroline's Case,* 2 B&B 284, 286-90, 129 Eng. Rep. 976,

Our cases have never adopted such a specific and detailed foundation rule. *State v. Carduff,* 142 W. Va. 18, 93 S.E.2d 502 (1956); *Spence v. Browning Motor Freight Lines, Inc.,* 138 W. Va. 748, 77 S.E.2d 806 (1953); *State v. Hicks,* 107 W. Va. 418, 148 S.E. 131 (1929); *Nash v. Insurance Company,* 106 W. Va. 672, 146 S.E. 726 (1929); *Wilson v. McCoy,* 93 W. Va. 667, 117 S.E. 473 (1923); *State v. Price,* 92 W. Va. 542, 115 S.E. 393 (1922); *State v. Long,* 88 W. Va. 669, 108 S.E. 279 (1921); *State v. Worley,* 82 W. Va. 350, 96 S.E. 56 (1918); *Jaggie v. Davis Colliery Co.,* 75 W. Va. 370, 84 S.E. 941 (1914); *State v. Kinney,* 26 W. Va. 141 (1885). What we have generally required is that the witness should be advised as to the existence of the prior inconsistent statement. Obviously, this requirement is often accomplished in the very question containing the substance of the prior inconsistent statement.

Defendants claim that Syllabus Point 5 of *State v. Sette,* 161 W. Va. 384, 242 S.E.2d 464 (1978), has basically altered our foundation rule:[9]

> "Prior inconsistent statements of prosecution witnesses in a criminal case are admissible for impeachment purposes without the need to lay any particular foundation for their admission."

We do not view *Sette* as a radical departure from our prior law. The discussion of the foundation point in *Sette* was brief and there was no attempt to assay our prior law or to examine the position of other courts. *Sette* did not involve a prior inconsistent written statement but rather a prior inconsistent oral statement. The witness who made the statement was not asked about it on cross-examination. Instead, defense counsel brought on another witness who testified about the prior inconsistent oral statement.

---

11 Eng. Rul. C. 183 (1820). The rule was so offensive to the barristers, who felt it inhibited their cross-examination, that they secured its abrogation by an act of Parliament in 1854. The *Queen Caroline's Case* rule was subsequently adopted by American courts without realizing that it was no longer controlling in England. *McCormick on Evidence,* p. 56 (1972 ed.).

[9] A similar point is made in F. Cleckley, *Handbook on Evidence,* p. 48 (1979 Supp.).

Rule 613, Federal Rules of Evidence, adopts a two-step rule which initially permits cross-examination as to a prior inconsistent statement without first developing a foundation, but on request, the prior statement must be shown or disclosed to opposing counsel. This latter provision is designed to protect against abuse where the cross-examiner does not have a prior statement. Moreover, the second phase of the rule goes on to provide that if counsel attempts to introduce the prior statement, the witness must be afforded an opportunity to explain or deny it.[10] A number of state courts have adopted a similar rule through uniform rules of evidence. *E.g.*, Arizona, Arkansas, Florida, Maine, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oklahoma, South Dakota, Washington, Wisconsin, Wyoming. *See* 3A Wigmore, *Evidence* § 1028 (Chad. rev. 1970 Supp.).

The essence of Federal Rule 613 is that while a specific foundation need not initially be made to impeach a witness with a prior inconsistent statement, the witness must be informed of the general nature of his prior inconsistent statement and be afforded an opportunity to explain or deny the same. There is also a right, if requested, on the part of his counsel to see any prior written statement or to have disclosed the contents of a prior inconsistent oral statement during the course of interrogation. All of the above is subject to the sound discretion of the trial court.

---

[10] Federal Rules of Evidence, Rule 613, provides:

"(a) *Examining witness concerning prior statement.* In examining a witness concerning a piror statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.

"(b) *Extrinsic evidence of prior inconsistent statement of witness.* Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801 (d)(2)."

We believe that the approach taken under the Federal Rules of Evidence is compatible with our prior practice. One of the best explanations surrounding the reason for Rule 613 is found in 3 Weinstein, *Evidence* 613-8 (1981):

"Rule 613, in accord with most commentators and recent revisions, rejects the rule of the Queen's case as giving the dishonest witness too great an advantage. A mendacious witness, forewarned about the terms of a statement, can reshape his testimony so that the efficacy of cross-examination as a truth-testing device is reduced.

"Rule 613 goes considerably further, however. It no longer requires that the witness be alerted to the statement and have an opportunity to explain before the statement can be used. See § 613[04], *infra.* Paragraph (b) of Rule 613 provides only that the witness be given an opportunity to explain, and the opposite party an opportunity to examine, without specifying the sequence in which this need be done. And explanation and examination may be dispensed with in the court's discretion when 'the interests of justice otherwise require.'

"The rule still, in some degree, seeks to promote accuracy of testimony. The provision in paragraph (a) for disclosure to counsel is designed to protect the witness from being misled by unwarranted insinuations about the statement. And paragraph (b) requires that in the absence of special circumstances the witness must ultimately be given an opportunity to avoid being discredited by inaccurate testimony."

Thus, we modify our prior ruling in *Sette* to state that while a specific foundation need not initially be made to impeach a witness with a prior inconsistent statement, the witness must be informed of the general nature of his prior inconsistent statement, and be afforded the opportunity to explain or deny the same. There is also a right, if requested, on the part of his counsel to see any prior written statement or to have disclosed the contents of a prior inconsistent oral statement during the course of interrogation. All of the above is subject to the sound

discretion of the trial court. This procedure was substantially followed in the present case and we, therefore, find no error on this point.

There are several other assignments of error contained in defendants' brief. However, defendants did not argue these assignments of error nor direct the court's attention to relevant portions of the record which sustain the propositions they raise. Assignments of error that are not argued in briefs on appeal may be deemed by this Court to be waived. *Quackenbush v. Quackenbush,* 159 W. Va. 351, 222 S.E.2d 20 (1976); *Higginbotham v. City of Charleston,* 160 W. Va. 694, 204 S.E.2d 1 (1974), *overruled on other grounds, O'Neil v. City of Parkersburg,* 160 W. Va. 694, 237 S.E.2d 504, 509 (1977).

For the foregoing reasons, the judgment of the Circuit Court of McDowell County is affirmed.

*Affirmed.*