427 S.E.2d 450

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Samuel MOORE, Defendant Below, Appellant.**

**No. 21016.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 16, 1992.

Decided Dec. 18, 1992.

18

Stephen Stockton, Asst. Atty. Gen., Charleston, for appellee.

Edward L. Bullman, Shaffer & Shaffer, Madison, for appellant.

PER CURIAM:

This case is before the Court upon the November 26, 1990, final order of the Circuit Court of Logan County sentencing the Defendant to life imprisonment without the possibility of parole for first degree murder, sixty years imprisonment for aggravated robbery, an indeterminate sentence of not less than one nor more than fifteen years for burglary, and a $100 fine for trespass, with all terms of imprisonment to be served consecutively. The Defendant makes the following assignments of error: 1) the trial court violated the prohibition against double jeopardy in allowing the jury to find the Defendant guilty of both aggravated robbery and first degree murder of the same victim; 2) the trial court committed error by failing to hold a hearing as required by *Watson v. Black,* 161 W.Va. 46, 239 S.E.2d 664 (1977), on the Defendant's request for a new court-appointed counsel; 3) the trial court erred in allowing evidence of alleged flight including, the Defendant's use of a disguise several years prior to the charged offense; 4) the trial court erred in allowing circumstantial evidence to go to the jury without a proper circumstantial evidence instruction; 5) the trial court erred in permitting the prosecuting attorney to read the statement of a witness, James Maynard, in closing argument when the statement was not ad-

mitted into evidence during the trial;[1] 6) the Defendant was denied effective assistance of counsel at trial by the failure of defense attorney to object to the State reading during closing argument the statement of a witness not previously admitted into evidence; 7) the trial court erred in failing to instruct the jury that, upon continuing their deliberations, they should not surrender well-founded convictions conscientiously held when the court had been informed by the jury that they were divided nine to three for conviction; 8) the trial court committed error by failing to properly instruct the Defendant about his right to testify and failing to obtain a knowing and intelligent waiver of that right on the record; 9) the trial court erred in allowing the State, during closing argument, to impermissibly comment on the Defendant's failure to testify or offer evidence. We find that the trial court erred in permitting the prosecuting attorney to read James Maynard's statement in closing argument without a cautionary instruction; however, we find this error to be harmless in light of the overwhelming evidence against the defendant, and accordingly affirm the decision of the Circuit Court of Boone County.

### FACTS

James Matthews testified that on August 3, 1987, he became concerned about his neighbor, Calvin Tomblin, because he had not seen Tomblin all day and Tomblin's garage door was uncharacteristically left cpen. Matthews then went over to his neighbor's home and upon looking in the garage, he discovered a "white piece of bradish cloth or mine tarp" with blood on it, a baseball bat with blood on it, Tomblin's Bible with blood on it and blood on the garage door. Matthews called the West Virginia State Police, who began an investigation.

Trooper Harper testified that at the scene he discovered a pair of broken glasses with bloodstains on them next to the Bible and ascertained that Tomblin's vehic-le was missing. Trooper Harper also testified that his investigation revealed that the last person known to have seen Tomblin alive was Marie Sargent.

Sargent testified that she saw Tomblin on August 2, 1987. According to Sargent's testimony, she and Tomblin had recently become engaged to marry. Sargent testified that, to her knowledge, the Defendant did not know the victim. However, Sargent had known the Defendant approximately two years prior to her engagement to Tomblin. She met the Defendant when he came to her house because his hands were frostbitten and she helped him. Sargent testified that she stopped taking care of the Defendant approximately one month prior to Tomblin's disappearance, which also was about the same time she began seeing Tomblin, and that approximately three weeks before Tomblin's disappearance, the Defendant had telephoned Sargent and said that "if he couldn't have [her] nobody else could."

The burned automobile belonging to Tomblin was found on August 5, 1987 at Sweetwater, a remote area of Wayne County, pursuant to a tip. Teresa Prince, an acquaintance of the Defendant, testified that she saw the Defendant and a male passenger driving a car in the same vicinity where the victim's burned car was found on August 2, 1987. While Prince positively identified the Defendant as one of the two individuals riding in the car on that date, she could not identify the passenger as the man reportedly hid his face.

Trooper Harper testified that on August 14, 1987, he received a tip that Raymond Spaulding and Loretta Brewer, Spaulding's girlfriend, might have information regarding Tomblin's automobile. Trooper Harper testified that after interviewing both of these individuals, he recovered a battery and an automatic jack from Spaulding's car, both of which had been removed from the victim's car prior to burning it. The battery, jack and Spaulding's car were seized at this time.

---

1. Based upon a review of the record, we only find it necessary to address this assignment of error.

Spaulding testified at trial that the Defendant approached him on August 2, 1987, and asked him to install a water pump on the Defendant's car. While the Defendant was waiting for a ride, he mentioned to Spaulding "that he had a car that needed a[n] insurance job done [on it]." When the Defendant's ride failed to come, the Defendant asked Spaulding for a ride to his girlfriend's house. Before Spaulding dropped the Defendant at the requested destination,[2] the Defendant asked Spaulding if he would return later and take him and his girlfriend to Sweetwater, West Virginia. Spaulding agreed to this request. Spaulding later returned with his girlfriend to the same place he had left the Defendant earlier that day. After waiting for a while, they finally met the Defendant on the road. The Defendant was driving what was later identified as Tomblin's automobile, without any girlfriend.

Both Spaulding and Brewer testified that they noticed that the Defendant had blood on him. The Defendant proceeded to take a jack out of the trunk of Tomblin's car and give it to Spaulding. Brewer testified that the Defendant also had a baseball bat with blood on it and a gun in his possession. According to both Spaulding and Brewer, the Defendant told them that he had been in a fight with some men who were trying to get his money. Spaulding testified further that the Defendant told them that the car he was driving belonged to his girlfriend's father and that he wanted to get rid of it. At this point in time, nothing was done to the car except that it was abandoned in the woods near Sweetwater.

The threesome went to Spaulding's home where the Defendant proceeded to clean up and change clothes.[3] The Defendant then asked Spaulding to take him back to Corridor G so that he could see a man who owed him some money. According to Spaulding,

while he and Brewer were driving the Defendant back to Corridor G, the defendant had Spaulding pull off the Corridor[4] and wait while he went and collected the money. The Defendant was gone for about an hour before returning with a bag of money from which he gave Spaulding approximately sixty dollars. Spaulding and Brewer then proceeded to take the Defendant home. Spaulding testified that during the trip, the Defendant again suggested that the couple return to Wayne County to strip his girlfriend's father's car. Spaulding and Brewer both testified that after driving the Defendant home, they returned to the wooded area near Sweetwater where the Defendant had left the vehicle. Spaulding then removed the battery before pouring gasoline on the interior of the car and igniting it.

After taking a statement from Spaulding, the state police began a search of the area located near Corridor G where Spaulding testified he had dropped off the Defendant on the night of August 2, 1987. On August 15, 1987, the state police found Tomblin's badly decomposed body. Trooper Harper testified that they also found the victim's billfold, without any money,[5] next to the victim.

Dr. Irvin Sopher, a forensic pathologist and Chief Medical Examiner for the State, testified that Tomblin's death was "due to both ... blunt force injuries to the head and ... [a] gun shot wound" to the head. Dr. Sopher further testified that the blunt force trauma could have been inflicted by a baseball bat like the one found in Tomblin's garage.

Following the discovery of Tomblin's body, a warrant was obtained for the Defendant's arrest on August 15, 1987. Trooper Harper testified that they initially attempted to serve the warrant on the Defendant at his home, but were unable to do

---

2. This house was later determined to be the victim's home.

3. The record indicates that the Defendant left his clothes at Spaulding's home until the next day when he went back and burned them with a pile of trash in Spaulding's backyard.

4. The description of the area where Spaulding let the Defendant out matched the area where Tomblin's body was later found, according to the record.

5. Evidence introduced at trial indicated that the victim always carried a large sum of money on his person.

so because of his absence. Trooper Harper received information from a friend of the Defendant's, James Maynard, that the Defendant might have gone to Ohio to try and break his son out of prison. Upon verifying that the Defendant's son was in an Ohio prison, Trooper Harper requested that the Ohio authorities help locate the Defendant. The Defendant was arrested in Ohio in late September 1987.

At trial, the State presented the testimony of James Maynard. Maynard testified that on August 2, 1987, the Defendant offered him $500 to burn a car. Maynard also testified that on August 2, 1987, the Defendant was in possession of a pistol like one described in Maynard's statement. Maynard testified that the Defendant showed him the $500 on August 2, 1987. Maynard also testified that on August 2, 1987, the Defendant had in his automobile a baseball bat like the one recovered from Tomblin's garage. Maynard further testified that the automobile the Defendant sought to burn belonged to the person the Defendant wanted to "get."

## THE STATEMENT

Most of Maynard's testimony was consistent with a prior statement he had given to police on August 17, 1987. At trial, however, one inconsistency developed. In that statement, he said that the Defendant had told him that "he was going to get Calvin Tomblin," but at trial he remembered the name as Calvin Kline.

The primary issue for resolution in this case is whether Maynard's out-of-court statement was properly admitted and used at trial. The Defendant argues that it was plain error for the trial court to permit the State to read a statement of a witness in a closing argument that was not admitted into evidence during the trial. The State, however, contends the statement was properly admitted and argues that it was not error for the trial court to allow its reading in closing.

The witness was questioned by the State concerning the inconsistency, but the written statement itself was not offered or admitted into evidence while either Maynard or the officer who took the statement were on the witness stand. At the close of the State's case-in-chief, however, the prosecutor "move[d] for the admission of all the exhibits in this case that have not been already admitted into evidence." The trial court granted this motion without objection by the Defendant.

Thus, the statement clearly was admitted into evidence. In determining whether the statement was properly admitted at trial, it is helpful to examine the exchange that occurred between the State and Maynard concerning his prior statement to the police.[6] Following is the exchange that occurred:

(By the prosecuting attorney)

Q: I want to ask you a question concerning the statement you gave to the police. Who did you give it to?

A: That officer [Trooper Harper] right there. (witness indicating.)

. . . .

Q: When and where did you give that statement?

A: He pulled me over one day and there was three or four of them in the car and they took my statement right there.

. . . .

Q: Would you mark this?

(Whereupon the item referred to, was marked for the purpose of identification as Plaintiff's Exhibit Number 69.)

. . . .

A: (Witness reviewing document)

It is the statement I made to him. (witness indicating)

Q: . . . Does it appear to be a true copy of the statement that you gave?

A: . . . Yeah.

Q: I would like you to read that statement now for the purpose of seeing if it refreshes your recollection as to who Sam [the defendant] told you on that occasion that he wanted to get?

---

**6.** It is important to note that Maynard's in-court testimony was consistent with his pre-trial statement in all respects until this exchange occurred.

A: Well, he said something about Calvin Kline but he didn't go into any details or nothing.

Q: Do you remember that now?

A: Yes, sir, I read it and it refreshed my memory.

Q: Read the statement again for the purpose of refreshing your recollection as to the last name of this Calvin that you have just testified about?

A: Do what now?

Q: ... Do you remember the last name of Calvin that Sam Moore gave to you on that occasion?

A: No.

Q: Well, read the statement.

A: I can't read.

At this point, the jury was excused while the statement was read to Maynard in order to refresh his memory. Upon the jury's return, the prosecutor asked Maynard if the reading of the statement refreshed his memory and Maynard responded that it did; however, Maynard still stated that he remembered Calvin's last name as being Kline. The State propounded no further questions and the defense did not question the witness.

The prosecutor began his closing argument by reading in its entirety the prior statement which Maynard made to the police in which he stated that "Sam told me that he wanted to burn the car and [that] he was going to get Calvin Tomblin." The issue of the propriety of the admission and use of Maynard's pre-trial statement must be examined in both the context of the law regarding substantive and impeachment evidence.

### SUBSTANTIVE EVIDENCE

■ Maynard's statement was not properly admissible as substantive evidence. West Virginia Rule of Evidence 801(d)(1)(A) provides:

A statement is not hearsay if—

(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition. . . .

In syllabus point 1 of *State v. Collins,* this Court held that:

Under Rule 801(d)(1)(A) of the West Virginia Rules of Evidence, a witness's prior inconsistent statement is not hearsay and may be used as substantive evidence if it meets certain prerequisites. First, the statement must have been given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition. Second, the statement must be inconsistent with the witness's testimony at trial, and the witness must be subject to cross examination.

186 W.Va. at 1, 409 S.E.2d 181 (1990); *accord,* Syl. Pt. 1, *State v. Moore,* 186 W.Va. 23, 409 S.E.2d 490 (1990). We also held in *Collins* that "[a] prior statement of a witness, even if given under oath, during the course of a police interrogation is not a statement made subject to the penalty of perjury or during a trial, hearing, or other proceeding as required by Rule 801(d)(1)(A) of the West Virginia Rule of Evidence." 186 W.Va. at 3, 409 S.E.2d at 183, Syl. Pt. 2.

■ Thus, Maynard's statement fails to meet the requirements necessary to be admitted as substantive evidence pursuant to West Virginia Rule of Evidence 801(d)(1)(A), because although it was inconsistent with the witness's testimony at trial, and the witness was subject to cross-examination, it was a statement given "during the course of police interrogation." *Collins,* 186 W.Va. at 3, 409 S.E.2d at 183." Therefore, it is not a "statement made subject to the penalty of perjury or during a trial, hearing, or other proceeding, or in a deposition," and was not properly admitted at trial under West Virginia Rule of Evidence 801(d)(1)(A).

### IMPEACHMENT EVIDENCE

West Virginia Rule of Evidence 613 provides the following:

(a) *Examining Witness Concerning Prior Statement.*—In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) *Extrinsic Evidence of Prior Inconsistent Statement of Witness.*—Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

■ In *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981), this Court summarized the impact that West Virginia Rule of Evidence 613 had on the introduction of extrinsic evidence of a prior inconsistent statement for impeachment purposes. In syllabus point 5 of *Addair,* we held that

While a specific foundation[7] need not initially be made to impeach a witness with a prior inconsistent statement, the witness must be informed of the general nature of his prior inconsistent statement, and be afforded the opportunity to explain or deny the same. There is also a right, if requested, on the part of his counsel to see any prior written statement or to have disclosed the contents of a prior inconsistent oral statement during the course of interrogation. All of the above is subject to the sound discretion of the trial court.

*Id.* at 307, 284 S.E.2d at 376. (footnote added).

■ We again interpreted West Virginia Rule of Evidence 613 in syllabus point 4 of *State v. Schoolcraft,* 183 W.Va. 579, 396 S.E.2d 760 (1990). In *Schoolcraft,* this Court held that

[w]here the witness cannot recall the prior statement or denies making it, then under W.Va.R.Evid. 613(b), extrinsic evidence as to the out-of-court statement may be shown—that is, the out-of-court statement itself may be introduced or, if oral, through the third party to whom it was made. However, the impeached witness must be afforded an opportunity to explain the inconsistency.

*Id.*

■ In the present case, the record is clear that the statement was admissible for impeachment purposes. The witness was informed of the prior inconsistent statement and was given ample opportunity to explain or deny the inconsistency. Moreover, the Defendant's counsel certainly could have interrogated the witness regarding the inconsistency. Thus, the State could have properly admitted Maynard's inconsistent statement for impeachment purposes pursuant to West Virginia Rule of Evidence 613 except for the failure of both the State and the trial court to comply with this Court's decision in *Collins,* 186 W.Va. at 1, 409 S.E.2d at 181 (1990). *See* 186 W.Va. at 23, 409 S.E.2d at 490.

In *Collins,* this Court held that "the trial court has an obligation to instruct the jury that the impeaching testimony may only be considered as bearing on the witness's credibility and not as substantive evidence." 186 W.Va. at 9–10, 409 S.E.2d at 189–90. Here, the trial court failed to give a limiting instruction that the statement was admitted for impeachment purposes only. Consequently, what effectively occurred, absent the instruction, was that otherwise properly admissible impeachment evidence was admitted improperly as substantive evidence. *See id.* at 3, 409 S.E.2d at 183, Syl.Pt. 4.

## HARMLESS ERROR

■ Rule 52(a) of the West Virginia Rules of Criminal Procedure provides that

---

7. As pointed out in F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4.2(B), at 162 (2d ed. 1986), while "[r]ule 613 abolishes the rule of 'show the witness the writing' ...[,] [a]ll that is required is that the witness be given 'an opportunity to explain or deny the statement' and that the opposite party be given an opportunity to interrogate the witness on the statement *before* introduction."

"[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The harmless error doctrine was interpreted by this Court in syllabus point 6 of *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188 (1987) (quoting Syl.Pt. 2, *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)) as follows:

'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.'

*Accord* Syl. Pt. 3, *State v. Edward Charles L. Sr.,* 183 W.Va. 641, 398 S.E.2d 123 (1990); Syl. Pt. 3, *State v. Maynard,* 183 W.Va. 1, 393 S.E.2d 221 (1990).

■ In the present case, we find no reversible error was committed since without Maynard's prior inconsistent statement, there was more than sufficient evidence to warrant a guilty verdict by the jury. The evidence included the Defendant's statement to Marie Sargent, the victim's girlfriend, that "if he couldn't have ... [her] nobody else could;" the testimony of Teresa Prince that she saw the Defendant and an unidentified male passenger driving the victim's car in the same vicinity where the victim's burned car was found on the last day the victim was seen alive; and the testimony of Raymond Spaulding and Loretta Brewer who placed the Defendant at the scene of the crime the day it was committed, and who both saw the Defendant with blood on him, saw the Defendant burn his clothes, and received a battery and an automatic jack from the Defendant which belonged to the victim. Additionally, Spaulding and Brewer burned the victim's car, and connected the Defendant to the various crime scene areas. Finally, Brewer testified to seeing the bloody baseball bat and gun which were the murder weapons. In light of the plethora of other evidence linking the Defendant with the commission of the crime, the particular statement made by Maynard cannot seriously be considered to have had any prejudicial effect on the jury's consideration of the issues in this case.

Based upon the foregoing opinion, the decision of the Circuit Court of Boone County is affirmed.

Affirmed.