478 S.E.2d 550

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Eugene BLAKE, Defendant Below, Appellant.**

No. 23458.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 1996.

Decided Oct. 11, 1996.

Victor S. Woods, Assistant Attorney General, Charleston, for Appellee.

George Castelle, Chief Public Defender, Charleston, for Appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, Eugene Blake, appeals his October 17, 1985, convictions for first degree murder and two

counts of third degree sexual assault.[1] The defendant raises several assignments of error, which we address below. We order a new trial on the murder conviction and affirm the sexual assault convictions.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 26, 1984, the body of thirteen-year-old Mary Ann Hope Helmbright was found about seventy-five feet from a road in a wooded area in Monongalia County, just north of Morgantown. The victim died of a gunshot wound to the back of the head.

According to the testimony of sixteen-year-old JoAnn Wiseman, a friend of the victim, she and the victim skipped school on Tuesday, October 23, 1984, and spent most of the day watching television. At about 6:00 p.m., as the victim and Ms. Wiseman were "set[ting] by the bakery down on Main Street" in Wheeling, they saw the defendant drive by. The two girls, who knew the defendant, "hollered" for him and, when he returned to where they waited, they asked him to get them drunk. The defendant agreed and told them he would pick them up at Ms. Wiseman's residence at 8:00 p.m.

The defendant picked the girls up at 8:00 p.m. and drove them to the local Super X drugstore where he purchased two bottles of wine. The defendant then parked behind a school, where the three talked and the victim and Ms. Wiseman drank from their bottles of wine. Ms. Wiseman recalled that at one point the defendant reached into his glove compartment and a revolver fell out. The defendant told the girls he carried the gun with him for protection. The defendant, the victim, and Ms. Wiseman stayed at the school for a half hour to an hour, and the defendant then drove Ms. Wiseman and the victim to Rosa's Cantina parking lot where he let them out some time between 9:00 and 9:30 p.m.

The two girls returned to Ms. Wiseman's apartment at approximately 11:00 p.m., where they joined Ms. Wiseman's twenty-year-old sister, Tina Lewis. The three left the apartment shortly before midnight and unexpectedly found the defendant parked in front. According to Ms. Wiseman, the defendant asked if they "wanted to go back out and drink." After making a call to her boyfriend from a pay phone across the street, Ms. Wiseman declined the defendant's invitation and went inside to bed, leaving the victim and Ms. Lewis talking with the defendant. Ms. Lewis testified the defendant gave her a forty-ounce beer to drink and then drove her and the victim to a package store in Ohio where he bought a bottle of wine for the victim. The three of them drove around for a while until Ms. Lewis asked to be driven back to Wheeling. The defendant dropped her off at about 1:25 a.m. on the morning of October 24, 1984. Before Ms. Lewis got out of the truck, she heard the victim ask the defendant to drop her off at a friend's house in North Wheeling.

---

1. The defendant explained the procedural history as follows. On October 29, 1985, the defendant was sentenced to life without parole upon the count of first degree murder, and to one to five years for each of the sexual assaults. On December 9, 1985, the defendant was sentenced to an additional life sentence as a recidivist, to be served consecutively. On March 26, 1987, the defendant filed a petition for appeal which was refused on May 19, 1987. By order of February 2, 1993, the Circuit Court of Marshall County found the defendant's counsel for the 1987 appeal petition had a conflict of interest and ordered the defendant be resentenced in order to renew the period in which to appeal. The circuit court also vacated the recidivist sentence upon a finding that the underlying convictions had been set aside by the Circuit Courts of Cabell and Wayne Counties.

The defendant was resentenced by the Circuit Court of Ohio County by orders dated July 7, 1993, and August 17, 1993. Upon the failure of appellate counsel to file an appeal, and upon the apparent disqualification of all Ohio County judges, a pro se petition for a writ of mandamus was granted, and the defendant's case was assigned to the Honorable John Madden, Judge of the Circuit Court of Marshall County, for further proceedings. The defendant was subsequently resentenced by the Circuit Court of Marshall County by orders of June 16, 1994, and November 16, 1994. On November 20, 1995, upon a finding that no appeal had yet been filed, the Circuit Court of Marshall County once again resentenced the defendant and this time appointed as appellate counsel the Public Defender of Kanawha County.

The bartender at the Silver Fox bar,[2] John Burdette, testified that on the morning of October 24, 1984, he saw the victim and the defendant emerge from the backroom of the bar some time between 1:30 and 2:00 a.m., although he did not see the two enter the bar.[3] The victim sat at the bar while the defendant went behind the bar to fix drinks for himself and the victim. Mr. Burdette noted that both appeared angry and the defendant "said something to the effect of bitch or whore or something like that." The defendant and the victim left the bar through the front door about ten or fifteen minutes after they emerged from the backroom.[4] On October 24, 1984, William Harvey was driving on Chaplin Road between 11:00 a.m. and 1:00 p.m. and, as he looked into the woods for deer, he noticed a blue object which he thought was a bag of garbage. Two days later, as the victim's body, wearing a blue jacket and blue jeans, was being retrieved from the woods, Mr. Harvey identified it as the "blue object" he had seen from the road.

At trial, Lynn Inman, a forensic biologist, testified she found seminal fluid on vaginal and anal swabs collected from the victim. Fluid found on the victim's underpants contained genetic markers for blood type A, consistent with the defendant's blood type.[5] The medical examiner testified small lacerations were found at the victim's vaginal inlet and on the edge of her rectum, indicating there had been forceful vaginal sexual intercourse and at least attempted forceful penetration into her rectum. Sperm found in the victim's vagina, some of which were intact and well preserved, indicated to the

medical examiner that they were deposited a short time before the victim's death. According to the medical examiner, the time of death of the victim was consistent with the early morning hours of October 24, 1984.

## II.

## DISCUSSION

The defendant makes several challenges to his conviction.[6] Despite the numerous issues raised, we limit our disposition of this appeal to the questions of whether the circuit court committed reversible error by excluding impeachment evidence in the form of a prior inconsistent omission of a crucial State's witness and whether the trial court erred by not advising the defendant of his right to testify. We find the exclusion of the impeachment evidence was erroneous, and such error requires the murder conviction to be reversed. Our further review of the record indicates the remaining issues are lacking in merit or have not been adequately preserved on this record.

## III.

## ANALYSIS

### A.

*Exclusion of Prior Inconsistent Statement*

The defendant contends the trial court erroneously refused to permit impeachment of a key witness by the use of prior inconsistent statements. During a polygraph examination on November 20, 1984, John Burdette, a witness for the State, denied any knowledge

---

2. The Silver Fox was managed by the defendant.

3. Mr. Burdette testified there was a door, generally kept locked, leading outside from the back room. He also testified there was a bed in the backroom of the Silver Fox bar, and that prostitution often took place there. Pam Chanze testified that some time in August, 1984, she approached the victim with the defendant's offer of $40 in exchange for sex. The victim refused his offer.

4. Three defense witnesses testified they saw the victim either later on October 24 or on October 25. Apparently, the jury did not find their testimony credible.

5. Genetic markers for blood type O, the victim's blood type, were also found on the victim's underpants.

6. Some of the assignments of errors are: (1) the trial court's refusal to allow the impeachment of a bartender with a prior inconsistent statement obtained during a polygraph examination; (2) the trial court's failure to instruct the defendant that he had a right to testify, as required by *State v. Neuman*, 179 W.Va. 580, 371 S.E.2d 77 (1988); (3) the trial court's failure to disclose exculpatory statements involving Fred Zain, a chemist for the Department of Public Safety; and (4) the trial court's admission of serology evidence which included such large statistics as to render the evidence more prejudicial than probative.

of the victim's death.[7] Previously, Ross Gray told police that John Burdette told him that as the defendant was leaving the Silver Fox bar with the victim on the morning of October 24, 1984, the defendant said, "Take a good look at this young, pretty c—t. It will be the last time you see her pretty face." Because Mr. Burdette's polygraph chart indicated he was withholding information, and because of Ross Gray's statement, Mr. Burdette was brought back to State Police Headquarters for further questioning on December 12, 1984. During that interview, Mr. Burdette admitted he had not been truthful and that he did indeed hear the defendant make the statement reported by Mr. Gray. At trial, Mr. Burdette testified the defendant did make the parting statement on the morning he was last seen with the victim. The defendant sought to present as prior inconsistent statements "[t]he questions and answers of the [polygraph] test without putting them in the context of a [polygraph] test or mentioning it." The trial court refused to allow the testimony on the basis that questions in a polygraph setting are framed differently than those in an ordinary interview.

■ A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are reviewed for an abuse of discretion. *See McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995). Even when a trial court has abused its discretion by admitting or excluding evidence, the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error. *See State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991). Instead, this Court will only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury. This reasoning suggests that when the evidence of guilt is overwhelming and a defendant is allowed to put on a defense, even if not quite so complete a defense as he or she might reasonably desire, usually this Court will find the error harmless. If, however, the error precludes or impairs the presentation of a defendant's best means of a defense, we will usually find the error had a substantial and injurious effect on the jury. When the harmlessness of the error is in grave doubt, relief must be granted. *O'Neal v. McAninch,* 513 U.S. 432, ——, 115 S.Ct. 992, 996, 130 L.Ed.2d 947, 955 (1995); *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

■ The defendant contends reversible error was committed by the exclusion of a prior statement made during a polygraph test that would have impeached the testimony of the State's most damaging witness. Generally, a prior inconsistent statement, although inadmissible to prove the results of a polygraph test,[8] is admissible as impeachment evidence pursuant to Rule 613 of the West Virginia Rules of Evidence.[9] Similarly, the decisional

---

7. Corporal R.L. Catlett of the West Virginia Department of Public Safety administered the polygraph test to John Burdette. Corporal Catlett testified *in camera* to the contents of the exam as follows:

 "In this case, the first question was: 'Is your first name John?'

 "And his response was, 'Yes.'

 "Have you told the total truth here today concerning Hopie's death?

 "His answer was, 'Yes.'

 "Do you know for sure who caused Hopie's death?

 "He answered negative—in the negative, 'No.'

 "And the fifth question was: 'Do you live in West Virginia?'

 "He answered, 'Yes.'

 "Sixth question was: 'Did you cause Hopie's death?'

 "He answered, 'No.'

 "Next question was: 'Did anyone tell you who caused Hopie's death?'

 "He answered, 'No.'

 "The last question was: 'Are you withholding information concerning Hopie's death?'

 "And he answered no to that question."

8. *See State v. Beard,* 194 W.Va. 740, 461 S.E.2d 486 (1995) (holding polygraph evidence unreliable); *State v. Chambers,* 194 W.Va. 1, 459 S.E.2d 112 (1995) (holding improper references to polygraph results reversible error).

9. Rule 613 of the Rules of Evidence provides:

 "(a) *Examining witness concerning prior statement.*—In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be

law in West Virginia is clear and well established that a party may ask a witness about any relevant statement made during a polygraph examination for the purpose of impeaching a witness's credibility. *See Heydinger v. Adkins*, 178 W.Va. 463, 360 S.E.2d 240 (1987); Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4-12(F)(3) (1994).

█ The admission of a prior inconsistent statement, however, is limited to specific circumstances. In those circumstances, the prior statement is not admitted for its truth but rather for the limited purpose of impeaching the witness. *See State v. Brown*, 179 W.Va. 681, 371 S.E.2d 609 (1988). Such a statement may not be admitted as substantive evidence: The inconsistent statement only serves to raise doubts regarding the truthfulness of both statements of the witness. *See State v. Collins*, 186 W.Va. 1, 6, 409 S.E.2d 181, 186 (1990). Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b)—notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact. *See State v. Carrico*, 189 W.Va. 40, 427 S.E.2d 474 (1993); *State v. Schoolcraft*, 183 W.Va. 579, 396 S.E.2d 760 (1990); *State v. King*, 183 W.Va. 440, 396 S.E.2d 402 (1990).

█ It is not disputed by the parties that a prior inconsistent statement may be used to impeach the credibility of a witness, if a proper foundation is laid in accordance with Rule 613. Rather, the dispute in this case centers around whether the two accounts differ in such a way to as to render them inconsistent considering the circumstances surrounding the taking of the prior statement. Neither party fully addresses the dispositive issue in this case. We believe the question to be answered is whether the alleged prior *omission* constitutes a prior *inconsistency.*[10] To be exact, this case does not involve a direct contradiction between trial testimony and a previous statement, but rather involves an omission of certain facts during a prior interview of the witness, about which facts the witness later testified at trial. Clearly, not every omission will constitute an inconsistency. Generally, a witness who testifies to certain matters cannot be impeached by showing his or her failure on a prior occasion to disclose a material fact unless the disclosure was omitted under circumstances rendering it incumbent or natural for the witness to state it. *See State v. Hines*, 130 Ariz. 68, 633 P.2d 1384 (1981). Indeed, the earlier cases in this jurisdiction hold the prior question must be substantially the same, indicating to the witness the same subject matter or transaction testified to at trial. *See State v. McLane*, 126 W.Va. 219, 27 S.E.2d 604 (1943); *Nash v. Fidelity–Phenix Fire Insurance Co.*, 106 W.Va. 672, 146 S.E. 726 (1929); *Morgan v. Franklin Insurance Co.*, 6 W.Va. 496 (1873).

█ When a prior inconsistent statement is offered to impeach a witness and the claimed inconsistency rests on an omission to

---

shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

"(b) *Extrinsic evidence of prior inconsistent statement of witness.*—Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

10. " 'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.' " *United States National Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 446, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402, 412 (1993), *quoting Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152, 166 (1991).

state previously a fact now asserted, the prior statement is admissible if it also can be shown that prior circumstances were such that the witness could have been expected to state the omitted fact, either because he or she was asked specifically about it or because the witness was then purporting to render a full and complete account of the accident, transaction, or occurrence and the omitted fact was an important and material one so that it would have been natural to state it. *See Asato v. Furtado,* 52 Haw. 284, 288, 474 P.2d 288, 292 (1970); *Sims v. State,* 530 P.2d 1176, 1179–80 (Wyo.1975). *See also Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86, 95 (1980) ("[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted"). The rationale for allowing impeachment under these circumstances is that "[a] failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact." 3A Wigmore, *Evidence* § 1042 at 1056 (Chadbourn rev.1970). *See also McCormick's Handbook on the Law of Evidence* § 34 at 68 (E. Cleary 2nd ed.1972). Thus, the underlying test should be whether the prior statement omitted a material detail, which under the circumstances would likely have been included if true. If so, the statement is inconsistent with testimony that includes this detail.

■ The primary thrust of the State's response to this assignment of error is that the defendant failed to demonstrate any prior inconsistency of the witness because the questions asked at the polygraph interview were not designed to elicit lengthy and fact specific answers. We disagree. The record simply belies any such failure on the part of the defendant. In fact, the transcript clearly discloses that not only was the testimony of the witness inconsistent, but the witness admitted his inconsistency to the polygraph operator. Mr. Burdette was asked during the polygraph examination about his involve-

ment and knowledge of the murder. He steadfastly denied having any such knowledge. This response was not only inconsistent with the witness's prior statement to Ross Gray, but, when the polygraph operator confronted Mr. Burdette with his prior statement made to Mr. Gray, Mr. Burdette admitted he intentionally and deliberately omitted telling the polygraph operator about the alleged conversation he had with the defendant in the early morning hours of October 24, 1984. Significantly, when asked whether he was being truthful, the polygraph operator testified at the *in camera* hearing that Mr. Burdette stated: " 'Yes, that's right. I haven't. And, in fact, I made that statement and the reason that I didn't say anything about it before was I didn't want to become involved in a murder case that I might be implicated in for withholding this information,' and that he was afraid of Blake, what he might do to him or have done to him." There can be no better indication of a prior inconsistent omission than when a witness later admits that he or she deliberately refused to disclose material information in a prior statement. Whether the witness's justification for not revealing this alleged conversation was credible was a jury issue, and the trial court committed error by keeping evidence of this omission from the trier of fact.

■ The State next raises the question whether the defendant met the procedural requirements to preserve this issue for appellate review.[11] Specifically, the State contends that even if the omission was a prior inconsistent statement, impeachment should not have been permitted because the defendant failed to lay the proper foundation for the admission of extrinsic evidence under Rule 613(b) of the Rules of Evidence. This argument baffles us. Unquestionably, a witness who is impeached by a prior inconsistent statement is entitled to limited confrontation before extrinsic evidence of his or her prior statement may be used for impeachment purposes. *See State v. Moore,* 189

**11.** Although the State does not raise the failure to comply with Rule 103(a)(2) of the West Virginia Rules of Evidence as a procedural bar to this appeal, we, nevertheless, are required to enforce this provision even though the parties are silent as to its application. Compliance with this rule is a prerequisite to any appeal regarding evidentiary error.

W.Va. 16, 427 S.E.2d 450 (1992); *State v. Carrico*, 189 W.Va. 40, 427 S.E.2d 474 (1993). The need for confrontation is even more pronounced in cases where the impeachment statement is not in the form of a document or recording. It would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo v. United States*, 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287, 1294 (1959). For the same reason, we conclude that under Rule 613(b) of the Rules of Evidence, a witness may not be impeached with a third party's characterization or interpolation of a prior oral statement unless the witness has the opportunity to subscribe, explain, and/or clarify the statement.

However, Rule 613(b) is not directly implicated in this case. As we read the record, the evidence sought to be introduced was the testimony of Mr. Burdette. Only if Mr. Burdette failed unambiguously to admit the omission could Trooper Catlett be called as a witness and extrinsic evidence offered. *See State v. Holmes*, 177 W.Va. 236, 351 S.E.2d 422 (1986). The trial court did not rule that extrinsic evidence was not admissible; it ruled the entire area of prior statements could not be used for impeachment. Thus, it would serve no purpose to lay a foundation for the admission of extrinsic evidence when the entire subject area of evidence sought to be introduced was excluded *in limine*. Furthermore, the common law foundational requirements were explicitly abolished by Rule 613(a): "In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time[.]" ˙ Under this rule, the only remaining requirement is that, upon request, the statement must be shown or disclosed to opposing counsel. Here, of course, the case did not develop to this point, but the State knew the exact omission about which the defendant proposed to examine the witness. We find the provisions of Rule 613 will not preclude us from reviewing the exclusion of evidence where the trial court grants a motion to exclude the evidence *in limine*. The only issue before us is whether enough of a record was made to establish error under Rule 103(a)(2). We find it was.

■ Our review of the record indicates that at no time after the trial court made its ruling excluding the impeachment evidence did the defendant make an offer of proof as to the specific impeachment testimony he intended to offer as required by Rule 103(a)(2) of the West Virginia Rules of Evidence.[12] Although we find this omission to have been extremely risky in this situation, for reasons we will discuss below, it is not fatal to the defendant's claim.

■ We do not believe the State was prejudiced by the failure of the defendant to meet the literal requirements of Rule 103(a)(2). The reasons for requiring offers of proof under Rule 103(a)(2) are twofold: They permit the trial judge to reevaluate his or her decision in light of the actual evidence to be offered, and they aid the reviewing court in deciding whether the alleged error was of such magnitude that it was prejudicial to the substantial rights of the defendant. We do not find the trial court was denied meaningful information before it made its ruling. First, we note Rule 103(a) provides an exception to the voucher rule if the information that would have been contained in the offer of proof is otherwise apparent from the record. Clearly, the record in this case was sufficient to inform all participants of the essence of the proposed testimony considering the *in camera* examination of the poly-

12. Rule 103(a)(2) of the Rules of Evidence provides:

"*Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

\* \* \* \* \* \*

"(2) Offer of proof.—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

graph operator.[13] Because of this testimony, both the prosecution and the trial court had in front of them the essence of what the defendant intended to offer.[14] Indeed, because of this specific record testimony, the State was able to argue successfully that the claimed prior omission was not sufficient to demonstrate an inconsistency.

■ Although invited to do so, this Court must decline the invitation to save this ruling on the basis of harmless error. We first set forth the legal framework. Assessments of harmless error are necessarily content-specific. Although erroneous evidentiary rulings alone do not lead to automatic reversal, we are obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affects the substantial rights of the defendant. We find the error in this case rose to this dimension. Making this determination involves the assessment of the likelihood that had the jury heard the excluded evidence, its outcome would have been affected. "[I]f one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946).

■ Latitude normally is permitted in cross-examining the State's witnesses, and limitations of such cross-examination may only be based on sound reasons justifying a departure from the norm. The defendant, of course, was entitled to a fair opportunity to cross-examine Mr. Burdette, the State's most damaging witness on the murder charge. It is apparent that Mr. Burdette might have had a motive to blame the defendant merely to shift prosecutorial focus from himself. Instead of permitting fair cross-examination, the trial court erroneously erected a protective barrier to effective cross-examination. The testimony of Mr. Burdette was crucial to the State's case. Indeed, it is the only evidence that directly links the defendant with the murder by providing a motive. The jury was entitled to know that the witness who accused the defendant of making this damaging statement had omitted on another occasion to reveal this statement to the police when he was asked about his knowledge of the murder.

We believe it is important in evaluating this error for prejudice to consider whether the jury had sufficient other information upon which it could have made a discriminating appraisal of the State's witness's testimo-

13. It seems clear to this Court what the two questions to Mr. Burdette by defense counsel would have been: "Mr. Burdette, isn't it true that on November 20, 1984, in your interview with Officer Catlett, you were asked whether you were withholding information concerning Hope Helmbright's death and you answered 'no?' And at no time during this interview did you state to the Officer that the defendant on the early morning hours of October 24 stated 'Take a look at this young, pretty c—t. It will be the last time you see her pretty face?' "

14. There are other reasons why we cannot strictly enforce the offer of proof requirement in this criminal case. Although Mr. Burdette was recalled by the defendant, defense counsel was entitled to cross-examine him as an earlier prosecution witness. Cross-examination is fundamental to a fair trial and insisting on offers of proof would undercut this important right. *See Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) (because of its exploratory nature, the cross-examiner need not indicate its purpose). Scholars have consistently acknowledged cross-examination as an exemption to the literal requirements of Rule 103(a)(2):

"The offer-of-proof requirement is not so strictly enforced when a party who wants to develop a point is cross-examining a witness. Since cross-examination usually proceeds by leading questions, the substance of the expected testimony is often apparent and the requirement is excused for that reason. There are other reasons to be generous with the litigant in this setting. For one thing, cross often seeks to test, probe, and limit the effect of the direct, and this process is ill-suited to the kind of explaining that an offer of proof typically involves. And while the essence of cross from the lawyer's perspective is to control the witness and ask questions he can answer in only one (anticipated) way, still the cross-examiner cannot always know how the witness will answer and cannot always control him. Hence questioning during cross is legitimately exploratory, and the cross-examiner should have leeway to persist in some blind questioning even though he [or she] cannot say what will develop." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 1.5 at 18–19 (1995).
*See also McManus v. Mason*, 43 W.Va. 196, 27 S.E. 293 (1897).

ny. In this case, no other witness corroborated the testimony in question, which we consider critical to the murder conviction. Our cases consistently make clear that when there is a possibility of a motive to lie, extensive cross-examination must be permitted. *See* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–11(F)(4)(b) at 799 (1994) (discussing West Virginia cases). Cross-examination is an even more effective method of getting at the truth than the oath. *See State v. Thomas,* 187 W.Va. 686, 691, 421 S.E.2d 227, 232 (1992) ("[c]ross-examination is the engine of truth"). To be certain, cross-examination in the interest of substantial justice seeking to elicit relevant truths should not be narrowly construed.

Furthermore, in our evaluation of prejudice in the impeachment area, we must distinguish between matters of general credibility and questions that might establish untruthfulness regarding specific events directly impacting upon the crime involved. In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court discussed the familiar strategy of a general attack on the credibility of a witness by evidence of a prior criminal conviction and then stated: "A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 354. Here, the impeaching statement went not only to the general credibility of the witness but specifically to the State's best and most effective evidence. On other occasions, we have declared reversible error from the failure of a trial court not to permit impeachment by prior inconsistent statements of a crucial witness of the State. *See State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981).

We appreciate the fact the trial court was concerned with the case getting out of hand in an area of law fraught with danger. Nevertheless, when the State undertakes a murder prosecution in which it relies primarily on the evidence of a witness who is vulnerable to claims of bias, interest, or lack of credibility, the prosecution rather than the defendant must bear the onus of the circumstance.

We, therefore, conclude the restriction on cross-examination was erroneous. We further conclude that we cannot say with fair assurance that the jury's verdict was not substantially swayed by the error. *See State v. Kelley,* 192 W.Va. 124, 451 S.E.2d 425 (1994); *State v. Allen,* 193 W.Va. 172, 455 S.E.2d 541 (1994). Accordingly, we reverse the murder conviction of the defendant and order a new trial on that count alone. All other convictions are affirmed.

B.

*Retroactivity of the Neuman Decision.*

The defendant contends the trial court committed error by failing to make a determination on the record that the defendant knowingly, voluntarily, and intelligently waived his right to testify in his own behalf as required by *State v. Neuman,* 179 W.Va. 580, 371 S.E.2d 77 (1988). We are asked to answer the question whether the *Neuman* rule is to be applied to cases tried before the *Neuman* decision which had not reached the appellate court until after the effective date of the decision. We accept the challenge and hold that *Neuman* is not to be applied to any cases tried or decided before its effective date unless the case presents "special circumstances."

The defendant argues that our prior decisions in *State v. Neuman, supra,* and *State v. Robinson,* 180 W.Va. 400, 376 S.E.2d 606 (1988), require us to vacate the entire judgment and remand for a new trial on all counts. As the defendant acknowledges, before we can address the merits of the *Neuman* claim, however, we first must determine whether in light of *Neuman* itself and established precedent, we must apply the *Neuman* rule to this case.

In *Neuman,* we for the first time held that to protect the right to testify in criminal cases, a criminal defendant should be advised that he or she has a right to testify or not to testify and, if he or she does not testify, then

the jury can be so instructed. *Neuman* places upon the shoulders of the trial court the obligation to question a defendant on the record to ascertain whether the defendant's waiver of his or her right to testify was made based on a complete understanding of his or her rights. After announcing the *Neuman* requirements, this Court expressly stated: "[T]he specific requirements of these procedural safeguards shall be applied prospectively *in cases other than the one before us.*" 179 W. Va. at 585, 371 S.E.2d at 82. (Emphasis added). Although *Neuman* makes clear that we did not intend for this new decision to apply to any case retroactively, the defendant contends we did so in *Robinson*, a case that is timewise similar to this one in that the case had been tried but not appealed at the time of the *Neuman* decision. We disagree with the defendant's reading of *Robinson*. First, the issue of retroactivity was neither raised nor discussed in *Robinson*. Second, and more significantly, the facts in *Robinson* presented "special circumstances" and did not require a retroactive application of *Neuman*.

In *Robinson*, the defendant expressed a desire to testify to limited matters at trial without being cross-examined as to other issues. The trial court "ruled that the prosecution could inquire into any matter relevant to the charges in the indictment." 180 W.Va. at 405, 376 S.E.2d at 611. Nevertheless, the defendant later took the stand and judicially confessed to his involvement in the cultivation of marijuana crops. We believe *Robinson* is not a case that demonstrates a *sua sponte* obligation on the part of a trial court to advise a defendant of his right to testify, but rather is a case where the trial court committed error by contributing to incomplete and confusing advice regarding the defendant's right to testify. Obviously, based upon the defendant's testimony in *Robinson*, there was a strong inference that he was confused. The record *sub judice* does not

indicate this degree of confusion. However, we do not rely solely on the aberrational nature of *Robinson* to hold that *Neuman* is not retroactive.

■ *Neuman* was adopted and modeled after the earlier decision of the Supreme Court of Colorado in *People v. Curtis*, 681 P.2d 504 (Colo.1984). In the *Curtis* opinion, like the decision in *Neuman*, the court refused to apply its new holding retroactively. In discussing its retroactivity analysis, the Colorado court quoted *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203 (1967), that held the criteria to be used in deciding the retroactivity of new constitutional rules of criminal procedure are: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." In applying the above criteria, the court in *Curtis* suggested that a silent record, as we have *sub judice*, does not "in and of itself raise serious doubts about the accuracy of a guilty verdict" and concluded that "retroactive application would be a significant burden on the administration of justice." 681 P.2d at 517. We agree.

*Neuman* announced a new rule that was without precedent in West Virginia's criminal jurisprudence. Simply stated: "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236, 245 (1994).[15] There is no question that the conviction of the defendant in this case was not final at the time of the *Neuman* decision. A conviction and sentence becomes final for purposes of retroactivity analysis when the availability of direct appeal to this Court is exhausted or the time period for such expires. Concededly, the general rule in this country is to apply

**15.** As suggested in *Caspari*, courts should apply a three-step analysis in determining retroactivity. First, we must determine the date on which the defendant's conviction and sentence became final for retroactivity purposes. Second, we must survey the legal landscape as it then existed and determine whether, when considering the defendant's claim at the time his conviction became final, we would have felt compelled by existing precedent to conclude that either the United States or the West Virginia Constitution requires the rule he seeks. Finally, if we determine that the defendant seeks the benefit of a new rule, we must decide whether the fundamental fairness and accuracy of the criminal proceedings exception requires us to reverse the conviction.

new law retroactively to cases that were pending on direct appeal at the time the new rule was adopted. Thus, appellate courts are obliged to apply the law as they find it at the time of the judgment. In *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987), the United States Supreme Court held: "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Nevertheless, we expressly find that the rule in *Neuman* was merely a procedural/prophylactic rule to guide courts in future proceedings and was not intended to apply to cases that were tried before the date of the decision. We believe that "a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty." ' " *Teague v. Lane*, 489 U.S. 288, 311, 109 S.Ct. 1060, 1076, 103 L.Ed.2d 334, 356 (1989), *quoting Mackey v. United States*, 401 U.S. 667, 693, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404, 421 (1971), *quoting Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937) To be clear, the *Neuman* requirements, like the *Miranda* warnings, are not constitutional rights themselves but are merely prophylactic standards designed to safeguard the right of every criminal defendant to testify in his or her own behalf. *See Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).[16]

 Unquestionably, selective retroactivity "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally," *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 537, 111 S.Ct. 2439, 2444, 115 L.Ed.2d 481, 489 (1991) (Souter, J., concurring), and invokes "the nature of precedent, as a necessary component of any system that aspires to fairness and equality." *James B. Beam Distilling Co.*, 501 U.S. at 543, 111 S.Ct. at 2447,

115 L.Ed.2d at 493. In avoiding the harshness of our prospective rule, we hold that a decision on retroactivity is to be given prospective application if: (1) It established a new principle of law; (2) its retroactive application would retard its operation; and (3) its retroactive application would produce inequitable results. We find the new rule announced in *Neuman* would both retard its operation and produce inequitable results. Before we penalize alleged judicial error, we must consider whether the sanction serves a valid and useful purpose. To invalidate, in hindsight, proceedings which were clearly consistent with our precedent at the time of their occurrence would be unfair to the prevailing party and the presiding judge who bear accountability for their actions. Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require a trial judge to anticipate all our decisions. The pressures of adjudication and the vagaries of criminal trial would make such an expectation unrealistic. In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), we refused to apply a new procedural requirement even to the party who raised the issue causing the decision. In justifying that decision, we stated:

"The trial court, prosecution, witnesses, and jury have a great deal invested in the trial. The judge did nothing wrong by following established precedent. This case is not a situation in which 'error' or objection was brought to the judge's attention, and, *in face of contrary law*, the judge went the wrong way. . . . It is unfair to burden society with new trials or hearings where they were conducted fairly according to law, and subsequently were made questionable by an opinion of this Court, but the perceived errors have not been shown to affect the integrity of the proceedings." 196 W.Va. at 315, 470 S.E.2d at 634.

*LaRock* establishes the precedent that an appellate court might, as a remedial matter, decline to apply a judicial decision retroac-

---

**16.** The United States Supreme Court refused to make retroactive either *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), or *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Johnson v. New*

*Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court held that *Escobedo* and *Miranda* affected only those cases in which trial began after the date of those decisions.

tively. In this view, retroactivity as a remedial matter presents a different question than does retroactivity as a choice of law matter (referring here to the choice of the new and old rules). In other words, technically under *LaRock,* an appellate court might simultaneously apply a decision retroactively yet relieve the adverse party of its full consequences based upon the equities of the particular case. We find this reasoning of *LaRock* compelling and it serves as an additional justification to refuse to apply the *Neuman* rule to this case. We conclude, as we should, that because *Neuman* clarified applicable procedural law only, and not substantive or constitutional law, it should be given prospective application only. To extend *Neuman* further than its announced purpose and reverse the conviction under the facts of this case would require far more persuasive arguments than those advanced by the defendant.

### IV.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Ohio County is affirmed, in part, and reversed, in part, and the matter is remanded for further proceedings consistent with this opinion.

Affirmed, in part, reversed, in part, and remanded.