**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 21-0630** (Berkeley County CC-02-2020-F-68)

**Robert Kramerage,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Robert Kramerage appeals the order of the Circuit Court of Berkeley County, entered on June 17, 2021, sentencing him to a cumulative term of imprisonment for life, without the possibility of parole, upon his conviction of first-degree murder, burglary, conspiracy to commit burglary, conspiracy to commit robbery, and unlawful possession of a firearm. He also appeals the circuit court's order, entered on July 9, 2021, denying his motion for a new trial or for judgment of acquittal.

Mr. Kramerage asserts two assignments of error on appeal. He argues, first, that the circuit court erred in permitting the State to cross-examine him about a recording previously suppressed in a pretrial order. He argues, second, that the circuit court erred in failing to grant his judgment of acquittal at the conclusion of the State's presentation of evidence. Upon our review, we determine that oral argument is unnecessary and that a memorandum decision is appropriate. See W. Va. R. App. Proc. 21.[1]

### I.

Mr. Kramerage was indicted on the charges listed above, as well as first-degree robbery, in February 2020, after law enforcement officers determined that he and two accomplices went to the home of a known drug dealer with the intention of robbing him. The attempted robbery ended in the shooting, and ultimately the death, of the dealer, Joshua Case. While Mr. Kramerage was jailed for unrelated charges, he was visited by his cousin, Lekia McDowell, who, unbeknownst to Mr. Kramerage, had already given investigators a statement admitting that she drove Mr. Kramerage and his accomplices to and from Mr. Case's home on the night of the murder. When

---

[1] Attorney B. Craig Manford filed a brief on behalf of Mr. Kramerage. Mr. Manford withdrew as counsel and Mr. Kramerage is now represented by Robert P. Dunlap II. Respondent State of West Virginia appears by Attorney General Patrick Morrisey and Assistant Attorney General William E. Longwell.

1

Ms. McDowell visited Mr. Kramerage, she wore a covert recording device at the investigators' request, and told Mr. Kramerage that she was concerned that she would be criminally charged. In response, Mr. Kramerage said, "They don't got nothing" and repeatedly advised Ms. McDowell that investigators had no meaningful evidence. Ms. McDowell disputed that there was no evidence, specifically noting that the police found her by identifying her car. She told Mr. Kramerage to "tell them the truth, so I will get out of this s—t." Mr. Kramerage told Ms. McDowell that his palm print was identified on an item found at the scene, but that the police nevertheless had insufficient evidence to charge him with a crime. He told Ms. McDowell, "Worse comes to worst . . . , stay silent." When Ms. McDowell told Mr. Kramerage that she had already told officers that she drove him on the night of the murder, he told Ms. McDowell to get the "f—k away," and the recording ended.

Prior to his trial, Mr. Kramerage filed a motion to suppress the recording of his conversation with Ms. McDowell on the ground that investigators circumvented Mr. Kramerage's right to the assistance of counsel and attempted to induce him to make incriminating statements. The circuit court granted the motion to suppress. During the trial, however, while Mr. Kramerage testified in his own defense, he admitted that he had visited Mr. Case's trailer with Ms. McDowell but stated that she lied about his involvement in the crime. He testified that he had a poor relationship with Ms. McDowell. The following transpired on cross-examination:

Q: So if you don't have a good relationship or close relationship with [Ms. McDowell], why did you call her when you got arrested and ask about her kids?

A: I called her when I got arrested and asked about her kids?

Q: Yeah, why did you do that?

A: Absolutely not.

Q: From jail. You know those calls are recorded, right?

A: I didn't call [Ms. McDowell]. I haven't talked to Ms. McDowell the whole time I have been incarcerated.

Near the conclusion of Mr. Kramerage's cross-examination, the assistant prosecutor suggested to the circuit court that the State would use the suppressed recording for impeachment. He explained, "I asked if he had called, about jail calls to [Ms. McDowell] from jail. His response was, I haven't talked to [Ms. McDowell] since I have been in jail, which is not factually true because of the recorded jail visit." Petitioner's counsel disputed that Mr. Kramerage invited the introduction of the suppressed recording, because the assistant prosecutor specifically asked about telephone calls. Mr. Kramerage, he argued, answered truthfully that he had not had a telephone conversation with Ms. McDowell while incarcerated. The circuit court ruled that Mr. Kramerage testified untruthfully and the State could use the recording for impeachment. Specifically, the court explained, "[H]e could have stopped at, he did not call her. He emphatically stated that he had not talked to her the whole time he's been incarcerated. . . ."

2

The assistant prosecuting attorney resumed his questioning: "Then I asked if you had called her from the jail and you said you have not talked to her since you were incarcerated. . . . That is not exactly true is it?" And Mr. Kramerage responded, "I haven't talked to her on the phone. So when you asked me that question, I guess I was—I was thinking you was talking about the phone. Absolutely not. He set up a visitation between me and her that lasted a few minutes." Mr. Kramerage then informed the circuit court that he wished to "take the Fifth or not answer the question." The circuit court explained that this option was not available to him. The assistant prosecuting attorney proceeded to question Mr. Kramerage about his conversation with Ms. McDowell. When Mr. Kramerage testified that he did not recall portions of the conversation, and when Mr. Kramerage continued to express uncertainty about the contents of the conversation, the court allowed the recording to be played for the jury. Though his counsel objected, Mr. Kramerage on at least one occasion asked the assistant prosecuting attorney, "Could you rewind it so I could hear it again?"

Mr. Kramerage argues that the circuit court erred in ruling that his testimony "opened the door" to the use of the suppressed recording. Rather, he argues, "the State invited the error by its broad and relentless examination on the topic of jail phone calls."[2] "In considering the admissibility of impeachment evidence, we apply the same standards of relevance that we apply to other questions of admissibility." *State v. Guthrie*, 194 W. Va. 657, 680-81, 461 S.E.2d 163, 186-87 (1995). "'"Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, [171 W.Va. 639], 301 S.E.2d 596, 599 (1983)." Syl. pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)." Syl. Pt. 4, *State v. Farmer*, 185 W.Va. 232, 406 S.E.2d 458 (1991).'" Syl. Pt. 1, *State v. Michael C.*, 248 W. Va. 75, 887 S.E.2d 60 (2023).

We find that the circuit court did not abuse its discretion when it ruled that Mr. Kramerage's testimonial statement "I haven't talked to Ms. McDowell the whole time I have been incarcerated" exposed him to impeachment through the suppressed recording that showed that the two had, in fact, talked while he was jailed.[3]

[W]here [a] witness cannot recall the prior statement or denies making it, then under W. Va. R. Evid. 613(b)[4], extrinsic evidence as to the out-of-court

---

[2] The suppressed audio was, as noted in this decision, a recording of a conversation that Ms. McDowell had with Mr. Kramerage when she visited him at the regional jail. It is not clear whether Ms. McDowell and Mr. Kramerage also had telephone conversations while he was jailed. We note that Mr. Kramerage argues in his brief that he *testified* that he did not call Ms. Lekia while he was jailed, but he neither argues that there is a lack of evidence of telephone calls nor that the State pursued this line of questioning knowing that there was no telephonic communication.

[3] Mr. Kramerage does not aver that he requested a limiting instruction, and he does not argue that the circuit court failed to give one.

[4] Rule 613(b) of the West Virginia Rules of Evidence provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity

3

statement may be shown—that is, the out-of-court statement itself may be introduced [in documentary or recorded form] or, if oral, through the third party to whom it was made. However, the impeached witness must be afforded an opportunity to explain the inconsistency.

*State v. Schoolcraft*, 183 W. Va. 579, 584, 396 S.E.2d 760, 765 (1990). Mr. Kramerage denied that he spoke with Ms. McDowell while jailed. The recording diametrically refuted that testimony. The assistant prosecuting attorney questioned Mr. Kramerage about the recording, and throughout the questioning, Mr. Kramerage was given the opportunity to explain. He testified,

When the conversation first started she just come in there hysterical like they are going to take my kids and this and that so I was trying to, like, give her advice like, you know, calm down, be quiet, stay cool, don't talk to the police, of that nature.

Not until the middle of the end of the conversation did I figure out it was about this. I just was talking to her about how previously I was just interviewed by the police and just stay calm, I have been through this, like, I was trying to give her advice. . . . I am not going to say on how to get away with robbery and murder. Just, you know, anytime you are ever charged with anything you invoke your right to counsel, you be quiet, you know.

Furthermore, on redirect examination, Mr. Kramerage's attorney gave him ample opportunity to explain why he was "protecting" Ms. McDowell, and he testified that he believed that Ms. McDowell was trying to implicate him.

Mr. Kramerage offered a statement during his trial testimony that was demonstrably refutable by the recording of his conversation with Ms. McDowell. The circuit court did not abuse its discretion is permitting impeachment on this ground, and we find no merit in petitioner's first assignment of error.

## II.

In his second assignment of error, Mr. Kramerage argues that the circuit court should have either directed a verdict in his favor at the close of the State's evidence or later ruled that the jury's verdict was contrary to the evidence. In short, Mr. Kramerage argues that the evidence was insufficient to support his criminal conviction.

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable

to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."

4

to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Ms. McDowell testified at Mr. Kramerage's trial that Mr. Kramerage asked her to drive him and two other men to a trailer park, where the first accomplice pointed out Mr. Case's trailer. Ms. McDowell left Mr. Kramerage and the second accomplice at the trailer park, as the accomplice began putting a mask over his face. Ms. McDowell drove to a nearby convenience store to wait. Mr. Kramerage called her to pick them up, and as she drove into the trailer park, Mr. Kramerage and his accomplice came running from the woods. Mr. Kramerage was carrying a jar of coins. He entered her car saying, "I f---ed up. My life is over." When investigating officers identified Ms. McDowell through the identification of the car that she drove, Ms. McDowell identified Mr. Kramerage and the accomplices.

Mr. Case's girlfriend was inside Mr. Case's trailer when two masked men knocked on the door and called out a false name. The girlfriend was briefly held at gunpoint and she was present when one of the intruders shot Mr. Case, but she was unable to identify which man shot him. She said that one of the men took a jar of change from the home as he fled. She also testified that one of the intruders picked up and threw a small refrigerator while the other intruder struggled with Mr. Case. One of the investigating officers later testified that Mr. Kramerage's palm print was found on the refrigerator.

One of the accomplices, Michael Phillip Browning, Sr., testified that Mr. Kramerage contacted him on the evening preceding Mr. Case's murder and asked for his assistance in robbing a drug dealer. Mr. Browning entered the Case trailer with Mr. Kramerage after Ms. McDowell dropped them off in the area. He testified that he held the girlfriend at gunpoint while Mr. Kramerage struggled with Mr. Case. He testified that Mr. Kramerage shot Mr. Case, and then struck him on the head with his gun.

We often caution that "[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden." *Id*. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. "[A] jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id*. Mr. Kramerage has not risen to meet this burden. The evidence set forth above is clearly sufficient to sustain the jury's verdict, and we perceive no error in the circuit court's treatment of the evidence.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** September 19, 2023

**CONCURRED IN BY:**

Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

**DISSENTING:**

Chief Justice Elizabeth D. Walker
Justice C. Haley Bunn


BUNN, Justice, dissenting, joined by Chief Justice Walker:

I dissent to the majority's resolution of this case. I would have set this case for oral argument pursuant to Rule 19 of the West Virginia Rules of Appellate Procedure to thoroughly address the errors alleged in this appeal.

During the State's cross-examination of Mr. Kramerage, the trial court allowed the State to introduce extrinsic impeachment evidence via a recording that the trial court previously suppressed. The memorandum decision glosses over Mr. Kramerage's trial testimony and determines, without adequate analysis, that he made a statement contradicting the suppressed recording. It further fails to consider to what extent a recording may be used to impeach a witness.

I believe oral argument and a formal opinion would assist in a more comprehensive discussion of the applicable rules of evidence, including West Virginia Rule of Evidence 613(b), which concerns using extrinsic evidence of a prior inconsistent statement. This resolution also would allow us to fully address whether Mr. Kramerage's response to the State's questioning was, in fact, inconsistent with his prior statement. Finally, through oral argument and a formal opinion, we could consider the implications of the court's failure to give a jury instruction limiting the impeachment evidence and whether the area of impeachment pertained to a matter of sufficient relevancy. *See*, *e.g.*, Syl. pt. 1, *State v. Blake*, 197 W. Va. 700, 478 S.E.2d 550 (1996).[1]

---

[1] Syllabus point 1 in *State v. Blake*, 197 W. Va. 700, 478 S.E.2d 550 (1996), reads as follows:

> Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of

Accordingly, I respectfully dissent.



impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence—notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact.