**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

State of West Virginia,
**Plaintiff Below, Respondent**

**vs.)  No. 21-0228** (Wayne County CC-50-2020-M-AP-3)

**Johnny Ray D.,**
**Defendant Below, Petitioner**


**MEMORANDUM DECISION**


Petitioner Johnny Ray D., by counsel Gary A. Collias, appeals the Circuit Court of Wayne County's January 26, 2021, order affirming the magistrate court jury's verdict of guilty of misdemeanor domestic battery.[1] Respondent State of West Virginia, by counsel Patrick Morrisey and William E. Longwell, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In June of 2019, petitioner and his wife (the "victim") were involved in a domestic altercation during which each injured the other, and the victim stabbed petitioner with a steak knife. Both individuals were charged, and the victim eventually pled guilty to domestic battery for her role in the incident. Petitioner elected to proceed to trial on his domestic battery charge.

Prior to his trial, petitioner filed a motion in limine "to prohibit the State of West Virginia or any of its witnesses from referring to the fact that [petitioner] was previously convicted of a

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

sex crime in the Circuit Court of Mingo County, West Virginia in 20[10]."[2] The motion was not addressed before trial, but the magistrate court granted it when the parties appeared for trial on August 17, 2020. The court cautioned, though, that if petitioner "brings something up[,] [t]hen it might open Pandora's box."

Also on the day of trial, but before a jury was empaneled, petitioner informed the magistrate court,

> I think some of the jurors were allowed to see my client in an orange uniform with handcuffs; and I think they're going to recognize him, 'cause I intend to call him as a witness. . . . So I would ask for a mistrial on this basis. . . . My other option would be, if you're inclined not to grant a mistrial, is to do some individual voir dire, 'cause I don't think all the jury panel saw him. But, I think some of them were in here. If we could, maybe, ask each one of them, "Did you see somebody sitting here in an orange uniform?" or something like that, something to that effect.

The magistrate court denied petitioner's motion for a mistrial but agreed "it would be an appropriate response to try to eliminate the two or three jurors that might have seen somebody in orange." The court asked whether the jury panel could be questioned "as a show of hands," but the State and petitioner agreed that "you need to call them up individually to the bench." Once the jury pool was brought, as a group, into the courtroom, the court asked, "[H]ave you ever seen [petitioner] prior to this time, right this very minute? Has anybody ever seen him before, at all?" The prospective jurors answered, "No." The court asked again, "Anyone?" No juror responded.

The victim testified at trial that she left her husband in March of 2019 because he became romantically involved with another woman.[3] The victim moved in with one of her adult children, and petitioner remained in the marital home. On April 22, 2019, she returned to the marital home to retrieve her dog. Petitioner exited the home, and he and the victim spoke cordially for approximately ten minutes, but then, according to the victim, petitioner "kept getting real cranky, wanting me to give the dog back." The victim testified that petitioner "took his hand and pushed my head back." The victim then "pushed him back, and we got into a knock-down, drag-out on the porch. I'm not going to lie about it." Eventually the victim left, and no one called the police.

On June 4, 2019, the date of the incident giving rise to petitioner's domestic battery charge, the victim returned to the marital residence late in the evening. Petitioner had reportedly

---

[2] The motion contained no law or argument, but it was gathered from the parties' arguments on the motion that petitioner was convicted of incest, and the victim of that crime was one of his daughters. Petitioner's trial counsel was different from his counsel on appeal.

[3] The victim testified that petitioner, in fact, had multiple affairs over the course of their marriage. Each time she found out, she would forgive him and try to repair their marriage. The victim testified that she never became physical after learning of his affairs; instead, she would "just leave."

invited her over earlier in the day, but once she arrived, petitioner started "screaming at me, asking me why I was there that late." The victim testified that she decided to return to her daughter's home, but as she exited the marital home, petitioner "comes up behind me, grabs the doorknob and jerks it, and slams it closed so hard that everything on my refrigerator shook." The victim "turned around to get away from him. And when I did, he grabbed my neck, like that, and shoved me" against the kitchen countertop. The victim testified that she did not bring any knife or other potential weapon to the marital home, but she saw a knife laying on the kitchen counter, which she grabbed before "dart[ing] through the dining room." As she attempted her getaway, the victim slipped on a rug. She claimed petitioner caught her and put "his arm around my mouth . . . and pushed my lip into my teeth and started hitting me in the head right—I mean, just hitting me—and hit me in the side of the eye." Petitioner "got off of" the victim "a little bit," so she tried to leave again. "When I went to raise up, here he come again. And when he come up the second time, I took that knife, 'cause I wasn't all the way bent down—and I just went like that, just enough to get him off of me." After the victim stabbed or "poked" petitioner with the knife, he ran into a bedroom and began yelling that he was "bleeding to death."[4] The victim testified that she started to leave but returned and offered assistance. When she went to retrieve a towel, the victim said that petitioner "must have come out [of the bedroom] like a quarterback, because he charged me. . . . [H]e hit me so hard I went flying across the living room floor." Petitioner then ran out of the house, and the victim called 9-1-1. Corroborating her injuries, the jury was shown pictures of the victim's inner lip injury, a bump on her forehead, and a bruise on her chest.

Petitioner disputed the victim's version of events. He claimed that when the victim came to his house on June 4, 2019, he was not initially inclined to answer the door because, during their April of 2019 interaction, the victim "became aggressive" toward petitioner, "striking [him] in the face with her fist" and "striking [him] in the groin area."[5] The victim, however, reportedly told petitioner that their daughter had just died in a car accident and that their granddaughter had been taken to the hospital, so he opened the door and allowed the victim in. Petitioner testified that, after letting the victim in, he turned around to grab appropriate clothing to go to the hospital, and the victim hit him in the back of the head with a tire iron; "[t]hen, bam! I get hit a second time." Petitioner testified that as the victim raised the tire iron to strike petitioner again, he "reach[ed] up with [his] left hand and the tire-iron hits me here on the wrist." Petitioner said that he eventually grabbed the victim's wrist, "[a]nd when I did that, that's when I got stabbed with the knife." Petitioner, who was still holding the victim's wrist, stepped inside a bedroom, pushed the victim out of the room, locked himself inside, and tended to his wound. He eventually exited the bedroom, pushing the victim aside as he did so, and ran to a neighbor's house. The jury was shown photographs of petitioner's stab wound and a bruise on his wrist.

---

[4] Fortunately, petitioner's medical records indicated that the wound was only to "subcutaneous tissues without evidence of intra-abdominal penetration."

[5] Petitioner's girlfriend, who was with petitioner at his home during the April of 2019 incident, also testified on petitioner's behalf. Her testimony was consistent with petitioner's regarding the events of the April evening.

Petitioner also explained that, while he and the victim had separated and reconciled several times in the past, he had recently communicated to her that he wanted a divorce and was not interested in reconciling:

Q       Well, let's go back to April the 22nd. That's 2019, isn't it?

. . . .

Q       . . . . What, as far as you [and the victim] communicating, had things kind of started getting a little bit more aggressive or things not working you? You tell the jury.

A       In April?

Q       Okay.

A       She's looking to reconcile, and I told her that I didn't. Then, the problem was is when I told her I didn't want to reconcile, then, my girls wouldn't talk to me so much. Well, they'd go a couple days and not talk to me. But, when I would talk to [the victim] a little more and say, "What's wrong with the girls? Why aren't the girls talking to me now? I haven't did anything to them." You know?

And I had a sit-down with them, upfront, about I've asked their mother for a divorce, and told them why. And, so, whenever she was happy, then the girls were happy with me. But whenever mama wasn't happy, then, my daughters weren't happy.

. . . .

Q       Okay. Sorry. Were they all, basically, trying to vote, or convince you, to stay with mom?

A       Yeah. You know, it was—I don't really want to hurt anybody's feelings. But, the truth is that I was finished. I guess it's just hard, after so many years of marriage, just to say "I'm finished." I finally found the strength to; and I did.

In response to petitioner's testimony on direct concerning his daughters giving him the silent treatment, the State elicited the following testimony on cross-examination:

Q       You testified on the stand that [the victim] uses your daughters against you and she makes them mad and makes it where they won't talk to you. And you said "I haven't done anything to them." That's not true, is it?

A       That's not necessarily true.

4

Q    You were convicted of—

A    In one case, yes.

     [Petitioner's counsel]: Can I enter an objection, Judge, to his question.

     [Prosecutor]: You were con—

     [Petitioner's counsel]: Note our objection.

     THE COURT: So noted.

(Resuming)[6] [Prosecutor]:

Q    You were convicted of a felony, and that's what sent you to prison. And one of your daughters was the victim; is that not true?

A    That is true, sir. And, yes, sir, I owned up to that. And I did reconcile with my daughter, and she visited me often while I was in prison. And we went to a lot of counseling together when I got out of prison. And I helped her go through college, and I was actually there when she graduated college, from Southern. And, hopefully, she's still working her job for the Housing Authority.

The jury also heard from the responding officer, Wayne County Deputy Sheriff Mark Terry.[7] Deputy Terry testified that he responded to petitioner's home and was given consent to

---

[6] Earlier in petitioner's direct examination, while the jury was examining photographs that had been published to it, the State asked, "While they're doing that, may we approach?" The court said "yes," and the following is noted in the transcript:

     (Bench conference.)

[Prosecutor]:   Their entire case is trying to paint—

     (Remaining conversation inaudible.)

     (Open court.)

THE COURT: All right. We're back on the record.

Petitioner asserts that during this unrecorded conference, the parties thoroughly discussed the admissibility of petitioner's prior conviction. In its response to petitioner's appeal to the circuit court, the State acknowledged that "a long side bar discussion" occurred.

search. Petitioner reported to the officer that the victim had struck him in the head with a tire iron or crowbar, but the officer found no such tool after "search[ing] in the residence," "around the residence a couple times," and in the victim's car. And, although the officer initially believed that petitioner "had a pump-knot on the back of his head, which was consistent with what he said about being hit by a crowbar," the officer realized "when I was in with his lawyer, just now, . . . I believe that's actually just his normal skull that sticks out on the back of his head." Deputy Terry no longer believed that petitioner had any sort of injury to the back of his head on the night of the altercation. With regard to other injuries he observed on petitioner, Deputy Terry described treating petitioner's abdominal wound, and the officer thought petitioner's "feet were a little dinged up, [from] running barefoot on gravel, grass, that kind of thing."

By contrast, Deputy Terry observed "a pump-knot and bruising form" on the victim, along with what appeared to be swelling around the top of her orbital socket." The officer testified further that the placement of petitioner's blood on the victim's jacket was consistent with the story she told as to how the stabbing occurred, i.e., that petitioner was behind her and she stabbed "in a cross-body motion like going around the side of her body." The officer testified that petitioner's version of the events—in which petitioner claimed that he and the victim were facing one another, that the victim held a tire iron in her left non-dominant hand and a knife in her dominant right, and that she stabbed him with the knife while he attempted to grab her other hand holding the tire iron—was not consistent with anything he saw at the scene.

Ultimately, the jury found petitioner guilty of domestic battery, and he was later sentenced to eight months in jail.

Petitioner appealed to the circuit court, claiming that the magistrate court erred, under Rule 404(b) of the West Virginia Rules of Evidence,[8] in admitting his prior conviction and that the court abused its discretion when it "knew prior to proceeding to trial [that] most [of] the jury venire were permitted to see petitioner in a WVDOC orange jumpsuit, handcuffed and shackled, prior to the beginning of the trial." Petitioner noted that the magistrate court "only asked the jury pool if anyone recognized the [petitioner], who at that time was unshackled and in regular clothing."[9]

---

[7] Petitioner's and the victim's respective statements were played for the jury during Deputy Terry's testimony.

[8] Rule 404(b) of the West Virginia Rules of Evidence, addressing crimes, wrongs, or other acts, prohibits the use of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Permitted uses for the evidence, none of which are purported to be applicable here, are also set forth in the rule.

[9] Petitioner raised a third ground in his appeal to the circuit court, but because he does not raise that ground before this Court, it is not recounted here.

Following a hearing, the circuit court entered an order on January 26, 2021, affirming the jury's verdict. The court did not address the magistrate court's admission of petitioner's prior conviction under Rule 404(b). Rather, the circuit court found that

> [t]he State used the prior conviction to question [petitioner] about the victim staying with him despite the conviction and to rebut [petitioner's] testimony that he had never done anything to his daughters, and that the victim was just turning them against [petitioner] for no reason. Rule 404(a)(2)(A) [of the West Virginia Rules of Evidence] allows a [d]efendant to offer evidence of a defendant's pertinent trait, and if admitted, the prosecutor may introduce evidence to rebut it.[10]

Accordingly, the circuit court found no abuse of the magistrate court's discretion in admitting the challenged evidence.

The circuit court likewise found no abuse of the magistrate court's discretion in its denial of petitioner's motion for a mistrial. The court observed that

> there is nothing more than speculation that potential jurors saw [petitioner] in a WVDOC orange jumpsuit, handcuffed, and shackled prior to the beginning of the trial. There is no evidence that a juror sitting on the selected jury panel saw [petitioner]. To the contrary, there is evidence based on individual questioning of the jurors that none of the jurors recognized or knew [petitioner].

It is from the court's January 26, 2021, order affirming the jury's verdict that petitioner appeals, and our review is guided by the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997).

In his appeal to this Court, petitioner assigns as error the same grounds raised before the circuit court. Thus, he first claims error in the magistrate court's ruling allowing the State to question petitioner regarding his 2010 conviction for incest, which the magistrate court, in

---

[10] Rule 404(a) of the West Virginia Rules of Evidence includes exceptions to the general rule that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." The exception relied on by the circuit court provides that "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."

granting petitioner's motion in limine, had previously determined to be inadmissible. Petitioner argues that the magistrate court failed to conduct the necessary analysis for admitting the evidence under Rule 404(b). *See* Syl. Pt. 2, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994) (setting forth the procedure for determining the admissibility of evidence offered under Rule 404(b)). Petitioner further disagrees with the circuit court's conclusion that the evidence was admissible under Rule 404(a). Petitioner maintains that he did not "open the door" to this evidence and that the lower courts, because they did not have the benefit of transcripts, misconstrued his testimony in finding otherwise. Lastly, petitioner argues that the evidence was irrelevant, and even if there were some minimal probative value, that value was outweighed by prejudicial effect.

We need not analyze the claim as framed by petitioner and determine whether the magistrate court should have examined the evidence's admissibility under Rule 404(b), whether the circuit court erred in relying on Rule 404(a), or whether petitioner, in fact, opened the door to the evidence[11] because, even if this Court assumes that evidence of petitioner's prior conviction was improperly admitted, he is not entitled to a new trial.

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. Pt. 3, *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990) (citations omitted). Without considering that petitioner was previously convicted of a felony and that his daughter was the victim of that crime, the evidence adduced at trial was more than sufficient to convince the jury of petitioner's guilt beyond a reasonable doubt. "Any person who unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member, or unlawfully and intentionally causes physical harm to his or her family or household member, is guilty of [domestic battery] . . . ." W. Va. Code § 61-2-28(a). Petitioner's victim, who was petitioner's wife on June 4, 2019, testified to the events that unfolded that night, including that petitioner "shoved" her, "grabbed [the] back of [her] neck," and "pushed [her] lip into [her] teeth and started hitting [her] in the head . . . in the side of the eye." She detailed that petitioner was the initial aggressor, and she denied bringing a knife, tool,

---

[11] "The opening the door 'doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context.'" *State v. Baker*, 230 W. Va. 407, 412, 738 S.E.2d 909, 914 (2013) (citation omitted).

or other potential weapon to the marital home on the night of the altercation. The physical harm petitioner inflicted upon his victim was documented in pictures, which were shown to the jury.

Additionally, Deputy Terry testified that nothing he observed at the scene supported petitioner's version of events. Despite looking in various locations, the officer never recovered a tire iron or similar item, and although he initially thought he saw an injury to petitioner's head consistent with petitioner's claim that he was struck there, it turns out that what the officer saw was "actually just the normal skull that sticks out on the back of his head." Deputy Terry concluded that the physical evidence, instead, supported the victim's version of events. Thus, there was sufficient evidence of petitioner's guilt, and we find further that any error had no prejudicial effect on the jury in view of this overwhelming evidence.[12] *See State v. Moore*, 189 W. Va. 16, 24, 427 S.E.2d 450, 458 (1992) (finding, in addressing whether an error was harmless, that "[i]n light of the plethora of other evidence linking the [d]efendant with the commission of the crime, the particular statement made by [a witness] cannot seriously be considered to have had any prejudicial effect on the jury's consideration of the issues in this case").

In petitioner's second assignment of error, he argues that the magistrate court should have continued his trial after learning that some of the jury venire may have been present in the courtroom when petitioner was brought in wearing his orange jail jumpsuit and shackles. Compounding the error, petitioner argues, the magistrate court conducted an inadequate voir dire in ascertaining whether any prospective jurors were present in the courtroom and saw petitioner.

Petitioner correctly points out that "[a] criminal defendant has the right under the Due Process Clause of our State and Federal Constitutions not to be forced to trial in identifiable prison attire," Syl. Pt. 11, *State v. Reedy*, 177 W. Va. 406, 352 S.E.2d 158 (1986) (citation omitted), and that "[a] criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syl. Pt. 3, *State v. Brewster*, 164 W. Va. 173, 261 S.E.2d 77 (1979). But petitioner's argument applying these points of law puts the cart before the horse. The record is clear that no juror saw petitioner wearing his prison garb or restraints, so these pronouncements—and the remedies for violating these rights—are inapplicable. And while petitioner may be dissatisfied with the manner in which the magistrate court ascertained that no prospective juror caught a prejudicial glimpse, "[t]he determination concerning whether and the extent to which to permit individual *voir dire* rests within the sound

---

[12] We also observe that, during the State's opening statement, it informed the jury that it would hear that petitioner and the victim were separated for "a period of time where [petitioner] was incarcerated." This drew no objection. In fact, petitioner also referenced his prior incarceration during his opening statement: "And you've heard that [petitioner had] been in prison for a time and [the victim] stuck by him, for that matter. He got out of prison and they tried to live together, but it didn't work out." So, some of the information petitioner claims the jury erroneously heard was already before the jury through petitioner's own presentation. Little more was gleaned during the challenged testimony, and certainly nothing that would have had a prejudicial effect on the jury in light of the other evidence presented.

discretion of the trial court, and is not subject to review in the absence of an abuse of discretion." *State v. Lassiter*, 177 W. Va. 499, 503, 354 S.E.2d 595, 599 (1987) (citations omitted). Because no juror indicated that they had seen petitioner prior to the very moment of questioning, the court did not abuse its discretion in not conducting individual voir dire into a matter of no concern.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 25, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Alan D. Moats, sitting by temporary assignment.

**DISSENTING:**

Justice William R. Wooton

Wooton, J., dissenting:

I respectfully dissent to the majority's affirmance of the magistrate court jury's guilty verdict in this matter. I would have placed this matter on the Rule 19 docket to fully examine whether the magistrate court erred in admitting evidence of Petitioner's prior conviction for a separate crime in Mingo County. To the extent evidence of his prior conviction was properly admitted, this Court should have set this for argument to determine whether the magistrate court erred in failing to "instruct the jury on the limited purpose for which such evidence has been admitted" as required by this Court's holding in Syllabus Point 2 of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

Accordingly, I respectfully dissent.